

# SEMIANNUAL
# REPORT TO THE CONGRESS



## OFFICE OF INSPECTOR GENERAL

U.S. GENERAL SERVICES ADMINISTRATION

October 1, 2020 – March 31, 2021

# CONTENTS

**1   OIG PROFILE**
2       OIG Profile
4       OIG Organization Chart
5       GSA's Management Challenges

**7   SIGNIFICANT AUDITS**
8       Significant Audits
17      Summary of Contract Audit Reports
18      FAR Disclosure Program
19      Statistical Summary of OIG Audits

**23  SIGNIFICANT INSPECTIONS**
24      Significant Inspections

**27  SIGNIFICANT INVESTIGATIONS**
29      Significant Investigations
29      Criminal Investigations
35      Civil Settlements
37      Investigations Of Senior Government Employees
37      Fleet Card Fraud
39      WPA Art Investigations
40      Other Significant Work
41      Statistical Summary of OIG Investigations

**45  GOVERNMENT-WIDE POLICY ACTIVITIES**
46      Government-wide Policy Activities

**49  APPENDIXES**
50      APPENDIX I
        Acronyms and Abbreviations

51      APPENDIX II
        Significant Recommendations From Prior Reports

57      APPENDIX III
        Audit and Inspection Report Register

59      APPENDIX IV
        OIG Reports over 12 Months Old, Final Agency Action Pending

61      APPENDIX V
        OIG Reports Without Management Decision

62      APPENDIX VI
        Management Decisions Revised or With Which the Inspector General is in Disagreement

63      APPENDIX VII
        Peer Review Results

64      APPENDIX VIII
        Government Contractor Significant Audit Findings

65      APPENDIX IX
        Unimplemented Recommendations

67      APPENDIX X
        Reporting Requirements

Cover Photo: GSA Building Exterior

# MESSAGE FROM THE IG

 I am pleased to submit to the Congress our Semiannual Report for the period of October 1, 2020 – March 31, 2021.

During this reporting period, our office again delivered strong financial results for the taxpayer: Our auditors identified more than $106 million in potential cost savings and our investigative work led to more than $52 million in recoveries and settlements.

Highlights of our work include an audit that found persistent problems in GSA's management of Personal Identity Verification (PIV) cards, which are used by federal and contract employees to access GSA buildings and information technology systems. In 2016, our inspectors reported several deficiencies in GSA's recovery and destruction of these cards. This past November, we issued an audit finding that the agency was unable to account for approximately 15,000 PIV cards issued to contract employees and failed to collect over half of the 445 PIV cards issued to those who failed their background checks. Poor management and oversight of these cards is a security risk because the cards can be used to gain unauthorized access to GSA buildings and information systems.

Our auditors also continued to monitor GSA's response to the COVID-19 pandemic. As described in our Alert Memorandum dated January 15, 2021, an ongoing audit in this topic area was significantly delayed by agency action throughout 2020 that inappropriately restricted our team's access to information and documents. Those restrictions have since been lifted and we expect to finalize the audit soon.

During this period, our special agents obtained results in highly complex fraud and corruption cases. In one such case, a business owner pled guilty to wire fraud for his company's scheme to fraudulently sell Chinese-made items as American-made. Another investigation led to the recovery of $11 million in combined criminal restitution and civil settlement proceeds from an electrical contracting company that fraudulently charged the government for design costs on energy savings performance contracts. An investigation of a former GSA senior contracting officer culminated in his sentencing to nearly 2 years in prison and a $10,000 fine for accepting bribes from a GSA schedule vendor.

In sum, despite the ongoing challenges of conducting our work in the midst of a global pandemic, we continue to perform our oversight mission with vigor. I remain grateful for the support of GSA and Congress, and for the dedicated work of the OIG staff.

*Carol F. Ochoa*

Carol F. Ochoa
Inspector General
March 31, 2021



Photo: The Internal Revenue Service Building, located in Washington, D.C.

# OIG PROFILE

Case 4:16-cv-02789-JSW   Document 48-8   Filed 11/01/21   Page 6 of 74

# OIG PROFILE

## ORGANIZATION

The General Services Administration (GSA) Office of Inspector General (OIG) was established on October 1, 1978, as one of the original 12 OIGs created by the Inspector General Act of 1978. The OIG's five components work together to perform the mission mandated by Congress.

The OIG provides nationwide coverage of GSA programs and activities. Our components include:

- **THE OFFICE OF AUDITS**, an evaluative organization staffed with auditors and analysts that provides comprehensive coverage of GSA operations through program, financial, regulatory, and system audits and assessments of internal controls. The office conducts attestation engagements to assist GSA contracting officials in obtaining the best value for federal customers and American taxpayers. The office also provides other services to assist management in evaluating and improving its programs.

- **THE OFFICE OF ADMINISTRATION**, a professional support staff that provides budget and financial management, contracting, facilities and support services, human resources, and Information Technology (IT) services, and administers the OIG's records management program.

- **THE OFFICE OF COUNSEL**, an in-house legal staff that provides legal advice and assistance to all OIG components, represents the OIG in litigation arising out of or affecting OIG operations, and manages the OIG legislative and regulatory review.

- **THE OFFICE OF INSPECTIONS**, a multi-disciplinary organization that analyzes and evaluates GSA's programs and operations through management and programmatic inspections and evaluations that are intended to provide insight into issues of concern to GSA, Congress, and the American public. The office also coordinates quality assurance for the OIG, and analyzes potentially fraudulent or otherwise criminal activities in coordination with other OIG components.

- **THE OFFICE OF INVESTIGATIONS**, a statutory federal law enforcement organization that conducts nationwide criminal, civil, and administrative investigations of illegal or improper activities involving GSA programs, operations, and personnel.

## OFFICE LOCATIONS

### Headquarters:

Washington, D.C.

### Field and Regional Offices:

Atlanta, Georgia; Auburn, Washington; Boston, Massachusetts; Chicago, Illinois; Denver, Colorado; Fort Lauderdale, Florida; Fort Worth, Texas; Kansas City, Missouri; Laguna Niguel, California; New York, New York; Philadelphia, Pennsylvania; Sacramento, California; and Oakland, California.

## STAFFING AND BUDGET

As of March 31, 2021, our on-board staffing level was 292 employees. The OIG's Fiscal Year 2021 budget is $67 million in annual appropriated funds plus $600 thousand in reimbursable authority.

OIG PROFILE – OIG ORGANIZATION CHART

As of March 31, 2021

# OIG ORGANIZATION CHART



**INSPECTOR GENERAL**
Carol F. Ochoa
**DEPUTY INSPECTOR GENERAL**
Robert C. Erickson, Jr.

**OFFICE OF COUNSEL TO THE IG**
Edward J. Martin
Counsel to the IG

**COMMUNICATIONS**
VACANT

**CONGRESSIONAL AFFAIRS**
Robert Preiss

**ASSOCIATE INSPECTOR GENERAL**
Larry Lee Gregg

**OFFICE OF INSPECTIONS**
Patricia Sheehan
AIG for Inspections

**OFFICE OF INVESTIGATIONS**
James E. Adams
AIG for Investigations

Intelligence Division

Data Analytics Unit

Digital Crimes and Forensics Unit

Criminal Intelligence Unit

Operations Division

Policy and Compliance Branch

Civil Enforcement Branch

**FIELD OFFICES**
Washington, D.C.
Boston
New York
Philadelphia
Atlanta
Chicago
Kansas City
Fort Worth
Auburn
Denver
Laguna Niguel
Ft. Lauderdale
Sacramento

**OFFICE OF AUDITS**
R. Nicholas Goco
AIG for Auditing

Audit Planning, Policy, and Operations Staff

Administration and Data Systems Staff

Real Property and Finance Audit Office

Acquisition and Information Technology Audit Office

Center for Contract Audits

**REGIONAL AUDIT OFFICES**
New York
Philadelphia
Atlanta
Chicago
Kansas City
Fort Worth
Oakland

**OFFICE OF ADMINISTRATION**
Kristine Preece
AIG for Administration

Budget and Financial Management Division

Human Resources Division

Information Technology Division

Facilities and Contracting Division

Records Management Program

# GSA'S MANAGEMENT CHALLENGES

The Reports Consolidation Act of 2000, Public Law 106-531, requires the Inspectors General of major federal agencies to report on the most significant management challenges facing their respective agencies. The following table briefly describes the challenges we have identified for GSA for Fiscal Year 2021.

| CHALLENGE | BRIEF DESCRIPTION OF CHALLENGE |
|---|---|
| Establishing and Maintaining an Effective Internal Control Environment | GSA continues to face significant challenges in establishing a comprehensive and effective system of internal control. While GSA has placed a greater emphasis on internal controls, our audit reports continue to identify internal control weaknesses across the broad spectrum of GSA programs, operations, and acquisitions. This indicates a need for direct management attention to develop a more effective internal control environment across GSA. |
| Improving Contract Administration | GSA faces a challenge in providing appropriate oversight of its contracts and leases. GSA is responsible for the procurement of billions of dollars' worth of products, services, and facilities for federal government agencies. After award, GSA is required to provide effective oversight of its contracts and leases to ensure that the government is receiving the goods and services it is paying for and to protect taxpayer dollars. Although GSA has taken, or is taking, actions to address oversight issues, our audit reports have repeatedly identified instances where oversight was either insufficient or lacking entirely. Without the appropriate level of oversight, GSA risks undetected fraud, waste, and abuse and violations of the Federal Acquisition Regulation. |
| Enhancing Government Procurement | GSA has a strategic goal of establishing itself as the premier provider of efficient and effective acquisition solutions across the federal government. As an integral part of GSA, FAS has significant responsibility in meeting this goal. According to FAS, its mission is to provide an exceptional customer experience by delivering best value goods and services through an increasingly digital environment. To meet GSA's strategic goal and comply with recent legislation, FAS is making significant changes to its processes and programs that create challenges to achieving its own mission. |
| Maximizing the Performance of GSA's Real Property Inventory | GSA is challenged with maximizing the performance of its real property inventory to meet the needs of its tenant agencies at a reasonable cost to taxpayers. To achieve this goal, PBS needs to effectively manage its real property inventory to reduce and consolidate space, dispose and exchange federal property, reduce leasing costs, administer the capital construction program, meet the operations and maintenance needs of aging buildings, and ensure effective management of energy and utility contracts. |
| Implementing GSA's Role Under the Comprehensive Plan for Reorganizing the Executive Branch | Although GSA has been prohibited from continuing merger-related activities with the U.S. Office of Personnel Management (OPM) pending the results of a study by the National Academy of Public Administration, it will face major challenges with any potential reorganization and transfer of several core functions currently performed by OPM to GSA. In the event of a potential merger, it is imperative that GSA obtain the necessary legal authority or legislation to execute the merger, exercise sufficient due diligence to make informed decisions, and engage relevant stakeholders effectively to ensure transparency in its merger efforts. |
| Managing Agency Cybersecurity Risks | As cybersecurity threats continue to increase and become more sophisticated, GSA management will remain challenged with identifying, implementing, and enforcing security controls to protect its systems and the sensitive information contained within these systems. Without the appropriate security controls in place to monitor, manage, and mitigate threats and risks to GSA's IT infrastructure, a cybersecurity attack or human error could easily disrupt organizational operations, placing GSA systems and sensitive information at risk. |
| Managing Human Capital Efficiently to Accomplish GSA's Mission | GSA continues to face the challenge with managing its workforce for continued success. GSA executives and senior managers confirmed that human capital is a top Agency risk. GSA must focus on hiring and retaining staff with the necessary skills to perform critical functions, especially given the number of GSA employees in mission-critical roles who will be retirement-eligible in the near future. GSA identified seven mission-critical occupational categories that make up 45 percent of GSA's workforce. GSA faces the loss of experience and expertise through retirements as 15 percent of the mission-critical workers are eligible to retire now and 32 percent will be eligible to retire over the next 5 years. The importance of a skilled workforce is highlighted by GSA's responsibility to provide value to customer agencies, comply with increased regulatory requirements, and mitigate the risk of IT security threats. |
| Safeguarding Federal Facilities and Providing a Secure Work Environment | GSA plays a significant role in providing a safe, healthy, and secure environment for federal employees and visitors at over 8,600 owned and leased federal facilities nationwide. Our audit reports and recent unrest in many cities demonstrate an ongoing need for GSA management to focus on the safety and security of federal facilities. In addition to physical security, our reports have also found that PBS has not taken adequate action to protect tenants, contractors, and visitors from environmental and health hazards. Our findings demonstrate that GSA faces ongoing challenges in safeguarding federal facilities and providing a secure work environment. |
| Managing the Impact of COVID-19 | GSA received $295 million in Coronavirus Aid, Relief, and Economic Security Act (CARES Act) funding to prevent, prepare for, and respond to the COVID-19 pandemic domestically or internationally. The COVID-19 pandemic has added to the complexities of GSA's responsibilities, by requiring the Agency to place an added focus on protecting the health and safety of building occupants. GSA has four primary responsibilities during a pandemic emergency: (1) protecting the health and safety of GSA employees, contractors, vendors, and visiting public; (2) maintaining mission-essential functions; (3) supporting federal response efforts; and (4) communicating with employees, tenants, and other stakeholders. Meeting the goals of the CARES Act and the responsibilities of the pandemic plan poses multiple challenges for GSA. |



Photo: Detail of recovered WPA painting "Landscape" by Theodore Polos

# SIGNIFICANT AUDITS

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 12 of 74

# SIGNIFICANT AUDITS

The Office of Audits conducts independent and objective audits to improve the effectiveness and efficiency of GSA's management and operations. These audits focus on GSA's programs, internal controls, IT infrastructure, and compliance with federal laws and regulations. Audits are also performed to assist GSA contracting personnel in obtaining the best value for federal customers. During this reporting period, we issued 28 audit reports, including 23 contract audits. Our contract audit work identified over $106.6 million in potential cost savings and recoveries for the federal government.

## PREAWARD AUDITS

GSA provides federal agencies with products and services through various contract types. We oversee GSA's procurement program, which generates billions of dollars in annual sales through thousands of contracts, by conducting preaward, postaward, and performance audits. Historically, for every dollar invested in our preaward audits, we recommend at least $20 in cost savings to the government through lower prices and more favorable contract terms and conditions for the benefit of the taxpayer.

The pre-decisional, advisory nature of preaward audits distinguishes them from other audit products. Preaward audits provide vital, current information enabling contracting officers to significantly improve the government's negotiating position to realize millions of dollars in savings on negotiated contracts.

During this reporting period, three of our more significant preaward audits were of schedule contracts with combined projected government sales of nearly $956 million. Through these audits, we identified potential savings and recoveries of over $93 million. We also found, among other things, that the commercial sales practices submissions were not current, accurate, or complete; contractors' proposed labor rates were overstated; price reduction provisions were ineffective; GSA was not receiving most favored customer pricing; billed rates exceeded GSA schedule rates; unqualified labor was billed; and prompt payment terms were not displayed on GSA schedule invoices.

## PERFORMANCE AUDITS

### ALERT MEMORANDUM: GSA IS IMPEDING OVERSIGHT OF ITS COVID-19 ACTIVITIES

**Memorandum Number A201018-4, dated January 15, 2021**

We issued this alert memorandum on GSA's efforts to impede our oversight of its COVID-19 activities by restricting and delaying information. To oversee GSA's Coronavirus Disease 2019 (COVID-19) activities, we initiated two projects: the Monitoring of GSA Activities in Response to the Coronavirus Disease 2019 and the Audit of PBS's Coronavirus Disease 2019 Communication and Cleaning Procedures.

In response to our oversight, GSA created a COVID-19 Audit Liaison Team (CAL Team). According to the GSA Chief of Staff, the CAL Team was "a small team of senior executives and managers ... to help us coordinate and efficiently respond to COVID-19 engagements with your office." However, the CAL Team established a centralized review and approval process of all OIG audit inquiries. The review and approval process required GSA personnel to report all OIG inquiries to the CAL Team and to provide a proposed response for its review and approval before responding to the audit team.

During the review process, GSA employees were coached or instructed to modify proposed responses to audit team inquiries, distorting or concealing the information. This process caused frequent and unnecessary delay, compromised the integrity of information provided by GSA personnel, and likely had a chilling effect on PBS employees' responses. The OIG audit team has little assurance that the responses provided to our inquiries are complete, accurate, and reliable.

Additionally, GSA attempted to restrict and delay the audit team's access to information and resources. In one instance, GSA revoked audit team access to GSA's COVID-19 situation reports in an attempt to restrict access to the information in the report and the supporting documentation. Access was only restored after GSA determined that providing access to the situation reports was less burdensome than providing the information through other means. In another instance, the audit team identified three potential breaches of personally identifiable information and requested all pertinent information in order to conduct an independent review. However, GSA delayed providing the information for over than 2 months.

Taken together, GSA's actions to restrict and delay information impeded the audit team's ability to identify areas of GSA's COVID-19 pandemic response that should be improved to protect the health of GSA's tenants, employees, contractors, and visitors. Subsequent to the issuance of our Alert Memorandum, GSA leadership notified us that the agency had disbanded the CAL team.

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 14 of 74

## GSA'S MISMANAGEMENT OF CONTRACT EMPLOYEE ACCESS CARDS PLACES GSA PERSONNEL, FEDERAL PROPERTY, AND DATA AT RISK

### Report Number A190085/A/6/F21001, dated November 4, 2020

Each year, GSA issues an average of 14,500 Personal Identity Verification (PIV) cards to contract employees who support GSA's programs and operations. Since 2016, our office has reported concerns over GSA's access card management GSA's management of contract employee PIV cards. In response to our long-standing concerns, we performed this audit to determine if GSA properly accounts for PIV cards issued to contract employees in accordance with federal regulation, policy, and guidance.

We found that GSA could not account for approximately 15,000 PIV cards issued to contract employees. In addition, GSA failed to collect over half of the 445 PIV cards from contract employees who failed their background checks. GSA's poor management and oversight of these cards raises significant security concerns because the cards can be used to gain unauthorized access to GSA buildings and information systems, placing GSA personnel, federal property, and data at risk.

We identified three factors that are affecting GSA's management of PIV cards for contract employees. First, GSA uses unreliable data to track and monitor PIV cards, which limits its ability to properly account for the cards. Second, GSA does not have formal procedures for recovering PIV cards from contract employees, forcing GSA personnel to use a patchwork of inconsistent and largely ineffective methods for recovering the cards. Lastly, GSA has not implemented the oversight needed to recover all PIV cards from contract employees.

Based on our audit finding, we recommended that the GSA Deputy Administrator: (1) continue to take action to account for and collect the PIV cards identified in our audit that remain outstanding and (2) ensure collaboration between Heads of Services and Staff Offices to require enforcement of current policy and implement new policy to account for all PIV cards issued to contract employees.

GSA agreed with our report recommendations.

## AUDIT OF GSA'S INSIDER THREAT PROGRAM

### Report Number A190016/I/T/F21002, dated February 17, 2021

We performed this audit to assess whether GSA's Insider Threat Program (ITP) has controls in place to prevent, deter, detect, and mitigate actions by trusted insiders who represent a potential threat to Agency personnel, facilities, operations, and resources. Insider threats involve employees using their authorized access, intentionally or unintentionally, to cause harm to an organization.

We found that GSA's ITP does not consistently collaborate across the Agency to proactively prevent, detect, mitigate, and identify insider threats. For example, the ITP is unaware of and does not monitor insider threat risks from employees who receive termination proposals, but retain access to GSA systems and facilities. Additionally, the ITP Senior Designated Official is failing to provide the annual insider threat report to the GSA Administrator as required. We also found that the ITP does not effectively monitor insider threat risks related to separated and terminated employees. GSA faces heightened insider threat risks from these employees because it does not consistently deactivate their information technology accounts and recover and destroy PIV cards within required time frames. Taken together, these deficiencies expose GSA information to theft or loss, facilities to damage, and personnel to actual or threatened harm; and create gaps that can be exploited in other ways to undermine GSA's ability to effectively carry out its operations.

Based on our audit findings, we recommended that the GSA Deputy Administrator and the ITP Senior Designated Official establish effective controls to enhance: (1) cross-organizational communication and collaboration with the ITP to improve information sharing and the ITP's access to insider-threat-related data and (2) oversight of the employee separation and termination process.

GSA agreed with our report recommendations.

## ALERT MEMORANDUM: BUILDING SAFETY CONCERNS IN PBS'S FEDERAL AGGREGATED SOLAR PROCUREMENT PILOT CONTRACTS IN REGION 9

**Memorandum Number A201020-2, dated October 27, 2020**

The purpose of this alert memorandum was to notify PBS of serious building safety concerns identified during our on-going audit of PBS's Federal Aggregated Solar Procurement Pilot (FASPP) contracts. We identified two buildings with significant safety concerns: the Leo J. Ryan Federal Records Center in San Bruno, California; and the United States Geological Survey Campus in Menlo Park, California.

We found that lightning rods around the solar arrays at the Leo J. Ryan Federal Records Center in San Bruno, California, did not have adequate protections in place to reduce the risk of impalement. We also noted potential fall hazards from loose ground wiring connected to the lightning rods and the slippery composition of the roof and significant reductions in visibility caused when sunlight reflects off of the building's white roof.

Additionally, we identified potential fall hazards at the United States Geological Survey Campus in Menlo Park, California. GSA contractors and employees routinely access the roof of the building to maintain the solar panels and other systems. However, we observed that the roof did not have a parapet or perimeter railing to protect against falls. Furthermore, warning lines or other markings were not present on the sides of the roof that are close to the installed solar panels.

PBS policy, Occupational Safety and Health Administration standards, and the FASPP contract require protective measures against safety risks. We notified the PBS Regional Commissioner that immediate action was necessary to address these safety hazards, enforce contract compliance, provide oversight, and implement measures to protect the safety of its personnel and contract employees.

## FAS'S PACKAGED OFFICE FURNITURE PROGRAM LIMITS OPPORTUNITIES FOR BETTER PRICES AND TAXPAYER SAVINGS

### Report Number A201009/Q/3/P21001, dated March 30, 2021

We performed this audit of the FAS's Packaged Office Furniture program due to concerns about the lack of a Commercial Sales Practices (CSP) disclosure requirement in the solicitation and how FAS contracting personnel determine fair and reasonable pricing without a CSP. Our objective was to determine if FAS adheres to federal regulations and FAS internal requirements for price evaluations when awarding and extending contracts with Special Item Number 33721P, *Packaged Office Furniture*.

Federal regulations and FAS policy require GSA contracting officers to seek the best price granted to the contractor's most favored commercial customer to ensure that each contract is priced separately and independently. However, FAS's Packaged Office Furniture program does not adhere to these requirements for contract awards to resellers.

FAS contracting officers are not seeking most favored commercial customer pricing when negotiating with resellers. Normally, contracting officers accomplish this requirement by obtaining the offeror's CSP disclosure and evaluating the pricing offered to its other customers. However, FAS does not require resellers to provide CSP information for Packaged Office Furniture products. Instead, FAS contracting officers award these contracts based solely on the manufacturers' schedule pricing and do not perform a separate and independent determination of fair and reasonable pricing as required by FAR and FAS policy. As a result, FAS limits its opportunities to target pricing that reflects the commercial market for better prices and savings for the taxpayer.

Based on this audit finding, we recommended that the FAS Commissioner ensure that contracts awarded to resellers under the Packaged Office Furniture program meet federal regulations and FAS policy by: (1) developing and implementing a plan to remove current solicitation language that does not require contractors to submit a CSP under Special Item Number 33721P, *Packaged Office Furniture*; and (2) developing and implementing controls to ensure compliance with Federal Acquisition Regulation 15.4, *Contract Pricing*; GSA Acquisition Regulation 538.270, *Evaluation of Federal Supply Schedule (FSS) offers*; and FAS Policy and Procedure 2018-03, *Proper Documentation of Price Analysis Decisions – Federal Supply Schedule (FSS) Program*.

The FAS Commissioner agreed with our report recommendations.

### OPTION AWARD AND EXTENSION OF THE BOSTON CONSULTING GROUP, INC.'S MULTIPLE AWARD SCHEDULE CONTRACT WITHOUT A FAIR AND REASONABLE PRICING DETERMINATION

Memorandum Number A180091, dated December 11, 2020

We issued a memorandum to the former GSA Administrator notifying her of our concerns with FAS's 5-year option award and extension of The Boston Consulting Group, Inc.'s (BCG's) Multiple Award Schedule Contract Number GS-10F-0253V.

In July 2019, we issued a preaward audit report advising the contracting officer that BCG's proposed pricing for its upcoming extension was unsupported by commercial pricing information. The contracting officer subsequently requested cost buildup information to support BCG's proposed rates. BCG refused to provide the requested cost buildup information. As a result, the contracting officer could not make a fair and reasonable pricing determination and issued a modification to cancel BCG's contract.

Although the contracting officer was unable to determine that BCG's proposed pricing was fair and reasonable, GSA management requested that the contracting officer rescind the cancellation modification. The contracting officer obliged and rescinded the cancellation. The contracting officer then issued another contract modification attempting to limit BCG from receiving new awards at pricing that is not fair and reasonable; however, the modification allows BCG to receive new orders under blanket purchase agreements until the contract's expiration in July 2024. Furthermore, the contracting officer has already issued a waiver to allow a new blanket purchase agreement to be awarded to BCG. This has allowed BCG to continue existing work and add new work to this contract until its expiration in July 2024 with pricing that has not been determined fair and reasonable. This violates the Federal Acquisition Regulation, General Services Administration Acquisition Regulation, and FAS policy.

We determined this warranted the former GSA Administrator's immediate attention as the extension of this contract without a determination of fair and reasonable pricing puts the government at risk of overpaying BCG for an estimated $860 million in sales over the remaining term of the contract.

The FAS contracting officer issued a modification to cancel BCG's contract on March 19, 2021, effective April 18, 2021.

## AUDIT OF THE SIDNEY R. YATES FEDERAL BUILDING EXTERIOR RESTORATION PROJECT

### Report Number A180110/P/R/R21001, dated February 4, 2021

The Sidney R. Yates Federal Building (Yates Building) is a historic building under the PBS National Capital Region's (PBS NCR's) portfolio. The building underwent restoration of its exterior masonry walls and associated wall components from October 2015 to May 2018. We initiated a formal audit of the contract administration for the Yates Building exterior restoration project based on a hotline complaint, which contained allegations of project mismanagement. Our audit focused on the overall project administration and the allegations in the complaint. Our audit objectives were to determine whether: (1) PBS NCR administered the contracts in accordance with federal regulations and Agency policy and (2) the allegations in the complaint of PBS NCR project mismanagement were valid.

We found that PBS NCR's project team did not effectively administer the contract for the Yates Building exterior restoration project, resulting in violations of regulations, policy, and contract terms. The PBS contracting officer's representative (COR) improperly re-delegated his responsibilities to the project manager, who was not certified to handle COR responsibilities.

We also found that the PBS NCR project team restricted contractors from performing contractual requirements and did not prepare contractor performance evaluations within required time frames. Finally, we found that the project team allowed contractors to work without valid PIV cards.

Based on our audit findings, we recommended that the PBS NCR Regional Commissioner: (1) establish contract administration controls to ensure that CORs do not re-delegate their responsibilities, and that only personnel who possess the necessary qualifications (as obtained through professional experience, training, and certification) to fulfill COR duties; contractor evaluations are completed as specified by the Federal Acquisition Regulation; project managers do not prevent a contractor or its subcontractors from performing a contractual requirement; and contractors working on projects have valid PIV cards, and (2) determine and implement corrective action needed to address the PBS NCR project team's conduct, including noncompliance with the Federal Acquisition Regulation, GSA Acquisition Manual, and PIV card requirements.

The PBS NCR Regional Commissioner agreed with the report recommendations.

## IMPLEMENTATION REVIEW OF CORRECTIVE ACTION PLAN: FAS CANNOT EVALUATE THE FAST LANE PROGRAM'S PERFORMANCE FOR CONTRACT MODIFICATIONS, REPORT NUMBER A170097/Q/7/P19001, OCTOBER 24, 2018

### Assignment Number A201039, dated March 5, 2021

On October 24, 2018, we issued our audit report, *FAS Cannot Evaluate the FASt Lane Program's Performance for Contract Modifications*, to FAS. The objective of the audit was to determine if FAS's FASt Lane Program achieved its purpose of providing GSA customer agencies quicker access to vendors with new and emerging technologies by streamlining FAS's process for awarding and modifying information technology contracts.

Our audit found that although FAS's FASt Lane Program appears to be meeting its goal for new contract awards, it cannot evaluate the program's performance for awarding contract modifications. As a result, we issued one recommendation to the FAS Commissioner to implement a process to evaluate and accurately report the FASt Lane Program's performance for contract modifications. The new process should identify and track FASt Lane modifications upon submission of the modification requests.

We conducted an implementation review to determine whether FAS completed its corrective action plan to address this recommendation. Our implementation review determined that FAS has taken appropriate corrective action to address the recommendation. We determined that no further action is necessary.

## OVERSIGHT OF THE INDEPENDENT AUDITOR'S AUDIT ON GSA'S FINANCIAL STATEMENTS FOR FISCAL YEAR 2020

As required by the Chief Financial Officers Act of 1990, Public Law 101-576, as amended, an independent public accounting (IPA) firm performed the Fiscal Year 2020 audit of GSA's financial statements. We monitored the audit for compliance with generally accepted government auditing standards and Office of Management and Budget Bulletin No. 19-03, *Audit Requirements for Federal Financial Statements*.

The IPA's audit did not identify any significant deficiencies or material weakness in internal controls.

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 20 of 74

## OVERSIGHT OF THE FISCAL YEAR 2020 INDEPENDENT EVALUATION ON THE EFFECTIVENESS OF GSA'S INFORMATION SECURITY PROGRAM AND PRACTICES

The Federal Information Security Modernization Act of 2014 (FISMA) requires an annual evaluation of each agency's information security program and practices. For Fiscal Year 2020, GSA contracted with an IPA to conduct its annual evaluation. We monitored the evaluation for compliance with quality standards and reporting guidance.

As required, the IPA conducted the evaluation and completed the Fiscal Year 2020 IG FISMA Reporting Metrics. The IPA concluded, based on the IG FISMA Reporting Metrics scoring model, that GSA's overall information security program was "effective." However, the IPA identified seven deficiencies within one of the five FISMA metric functions and provided 11 recommendations. GSA has opportunities to mature its information security program in FISMA domains across all five Cybersecurity Framework security functions.

During Fiscal Year 2021, the IPA performing the FISMA audit will review and follow up on the identified findings and recommendations under previous IPA FISMA evaluations that GSA has not addressed.

Case 4:16-cv-02789-JSW    Document 48-8    Filed 11/01/21    Page 21 of 74

# SUMMARY OF CONTRACT AUDIT REPORTS

The Office of Audits issues contract audit reports to provide assistance to contracting officials in awarding and administering GSA contracts. The two primary types of contract audits include:

- Preaward audits provide GSA contracting officials with information to use when negotiating fair and reasonable GSA contract prices.

- Postaward audits examine GSA contractor's adherence to contract terms and conditions.

During the period October 1, 2020, to March 31, 2021, we issued 23 contract audit reports. In these reports, we found:

- 14 contractors overcharged GSA customers.

- 13 contractors did not submit accurate, current, and complete information.

- 11 contractors either did not comply with price reduction provisions or did not have effective price reduction provisions.

- 7 contractors did not adequately accumulate and report schedule sales for Industrial Funding Fee payment purposes and/or did not correctly calculate and submit their Industrial Funding Fee payments.

- 5 contractors did not follow other terms and conditions of their contracts.

- 3 contractors assigned employees who were unqualified for their billable positions to work on GSA schedule task orders.

We also recommended over $106.6 million in cost savings. This includes funds that could be put to better use, which is the amount the government could save if our audit findings are implemented. It also includes questioned costs, which is money that should not have been spent such as overbillings and unreported price reductions.

**October 1, 2020 – March 31, 2021**

| CONTRACT AUDIT REPORTS | |
|---|---|
| Recommendations that funds be put to better use | $101,416,039 |
| Questioned Costs | $5,261,730 |

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 22 of 74

# FAR DISCLOSURE PROGRAM

The FAR requires government contractors to disclose credible evidence of violations of federal criminal law under Title 18 of the United States Code (18 U.S.C.) and the False Claims Act to agencies' OIGs. To facilitate implementation of this requirement, we developed internal procedures to process, evaluate, and act on these disclosures and created a website for contractor self-reporting.

### FAR RULE FOR CONTRACTOR DISCLOSURE

Federal Acquisition Regulation 52.203-13(b) implements the Close the Contractor Fraud Loophole Act, Public Law 110–252, Title VI, and Chapter 1. Under the rule, a contractor must disclose, to the relevant agency's OIG, certain violations of federal criminal law (within 18 U.S.C.), or a violation of the civil False Claims Act, connected to the award, performance, or closeout of a government contract performed by the government contractor or subcontractor. The rule provides for suspension or debarment of a contractor when a principal knowingly fails to disclose, in writing, such violations in a timely manner.

### DISCLOSURES FOR THIS REPORTING PERIOD

As disclosures are made, the Offices of Audits, Investigations, and Counsel jointly examine each acknowledgment and make a determination as to what actions, if any, are warranted. During this reporting period, we received 11 new disclosures. The matters disclosed include inflated employee timesheets; unqualified labor; Price Reductions Clause violations; contract disclosure deficiencies; IT security control deficiencies; and kickbacks. We concluded our evaluation of eight disclosures that resulted in over $1.2 million in settlements and recoveries to the government. We also assisted on six disclosures referred by another agency because of the potential impact on GSA operations and continued to evaluate 14 pending disclosures.

Case 4:16-cv-02789-JSW    Document 48-8    Filed 11/01/21    Page 23 of 74

# STATISTICAL SUMMARY OF OIG AUDITS

**October 1, 2020 – March 31, 2021**

| OFFICE OF AUDITS | |
|---|---|
| Total financial recommendations | $106,677,769 |
| These include: | |
| Recommendations that funds be put to better use | $101,416,039 |
| Questioned costs | $5,261,730 |
| Audit reports issued | 28 |
| Audit memoranda provided to GSA | 3 |
| **GSA Management decisions agreeing with audit recommendations** | **$362,649,518** |

## Audit Reports Issued

The OIG issued 28 audit reports. These reports contained financial recommendations totaling over $106.6 million, including more than $101.4 million in recommendations that funds be put to better use and over $5.2 million in questioned costs. Due to GSA's mission of negotiating contracts for government-wide supplies and services, most of the savings from recommendations that funds be put to better use would be applicable to other federal agencies.

## Management Decisions on OIG Audit Reports

Table 1 summarizes the status of audits requiring management decisions during this period, as well as the status of those audits as of March 31, 2021. There were no reports more than 6-months old awaiting management decision as of March 31, 2021. Table 1 does not include one implementation review that was issued during this period because it was excluded from the management decision process. Table 1 also does not include three reports excluded from the management decision process.

### Table 1. GSA Management Decisions on OIG Reports

| | NUMBER OF REPORTS | REPORTS WITH FINANCIAL RECOMMENDATIONS* | TOTAL FINANCIAL RECOMMENDATIONS |
|---|---|---|---|
| For which no management decision had been made as of 10/01/2020 | | | |
| Less than 6 months old | 19 | 10 | $64,796,812 |
| Six or more months old | 2 | 2 | $196,689,312 |
| Reports issued this period | 27 | 15 | $106,677,769 |
| **TOTAL** | **48** | **27** | **$368,163,893** |
| For which a management decision was made during the reporting period | | | |
| Issued prior periods | 21 | 12 | $261,486,124 |
| Issued current period | 14 | 10 | $101,900,439 |
| **TOTAL** | **35** | **22** | **$363,386,563** |
| For which no management decision had been made as of 03/31/2021 | | | |
| Less than 6 months old | 13 | 5 | $4,777,330 |
| Six or more months | 0 | 0 | $0 |
| **TOTAL** | **13** | **5** | **$4,777,330** |

\* These totals include audit reports issued with both recommendations that funds be put to better use and questioned costs.

## GSA Management Decisions on OIG Reports
## with Financial Recommendations

Tables 2 and 3 present the reports identified in Table 1 as containing financial recommendations by category (funds be put to better use or questioned costs).

**Table 2. GSA Management Decisions on OIG Reports with Recommendations that Funds Be Put to Better Use**

|  | NUMBER OF REPORTS | FUNDS BE PUT TO BETTER USE |
|---|---|---|
| **For which no management decision had been made as of 10/01/2020** | | |
| Less than 6 months old | 6 | $60,325,347 |
| Six or more months | 2 | $195,773,663 |
| Reports issued this period | 10 | $101,416,039 |
| **TOTAL** | **18** | **$357,515,049** |
| **For which a management decision was made during the reporting period** | | |
| Recommendations agreed to by management | 16 | $356,356,401 |
| Recommendations not agreed to by management | 0 | $0 |
| **TOTAL** | **16** | **$356,356,401** |
| **For which no management decision had been made as of 03/31/2021** | | |
| Less than 6 months old | 2 | $1,158,648 |
| Six or more months old | 0 | $0 |
| **TOTAL** | **2** | **$1,158,648** |

## GSA Management Decisions on OIG Reports with Questioned Costs

**Table 3. GSA Management Decisions on OIG Audit Reports with Questioned Costs**

| | NUMBER OF REPORTS | QUESTIONED COSTS |
|---|---|---|
| **For which no management decision had been made as of 10/01/2020** | | |
| Less than 6 months old | 6 | $4,471,465 |
| Six or more months old | 1 | $915,649 |
| Reports issued this period | 11 | $5,261,730 |
| **TOTAL** | **18** | **$10,648,844** |
| **For which a management decision was made during the reporting period** | | |
| Disallowed costs | 13 | $6,293,117 |
| Costs not disallowed | 1 | $737,045 |
| **TOTAL** | **14** | **$7,030,162** |
| **For which no management decision had been made as of 03/31/2021** | | |
| Less than 6 months old | 4 | $3,618,682 |
| Six or more months old | 0 | $0 |
| **TOTAL** | **4** | **$3,618,682** |

# SIGNIFICANT INSPECTIONS

Case 4:16-cv-02789-JSW   Document 48-8   Filed 11/01/21   Page 28 of 74

# SIGNIFICANT INSPECTIONS

The Office of Inspections conducts systematic and independent assessments of the agency's operations, programs, and policies, and makes recommendations for improvement. Reviews involve on-site inspections, analyses, and evaluations to provide information that is timely, credible, and useful for agency managers, policymakers, and others. Inspections may include an assessment of efficiency, effectiveness, impact, and sustainability of any agency operation, program, or policy. Inspections are performed in accordance with the Council of Inspectors General for Integrity and Efficiency's *Quality Standards for Inspection and Evaluation.*

During this reporting period, the office issued one inspection report with four recommendations.

## GSA'S NATIONAL CAPITAL REGION INTERNAL FLEET IS UNDERUTILIZED

### Report Number JE21-001, dated February 25, 2021

The Office of Inspections initiated an evaluation of GSA's management of its internal fleet of motor vehicles assigned to the agency's Headquarters and National Capital Region (NCR). The purpose of the review was to determine whether GSA managed its NCR internal fleet throughout fiscal year (FY) 2019, in accordance with both federal and agency requirements.

Since 1954, GSA has been providing motor vehicle services to federal agencies on a cost reimbursable basis. GSA serves more than 75 federal agencies and departments, including GSA, by acquiring and assigning leased vehicles. GSA's Office of Administrative Services (OAS), Office of Workplace Management and Services is responsible for the acquisition, management, and removal of motor vehicles in its internal fleet. Federal regulation requires agencies to justify a full-time vehicle assignment and provides minimum mileage guidelines that agencies may use to justify their fleet. Our evaluation found that over 99% of NCR vehicles did not meet both federal and GSA minimum mileage guidelines. While OAS identifies vehicles for elimination using data collected from vehicle studies, OAS must work with the individual customers to secure the proposed eliminations. OAS lacks any mechanism to require internal fleet customers to remove underutilized vehicles from the inventory and ensure efficiency. As a consequence, GSA spent an estimated $351,618 annually on these underutilized vehicles in FY 2019. Assuming continued underutilization, NCR could save up to an estimated $2.1 million by reducing its fleet of underutilized vehicles based on the average six-year minimum replacement standard of these vehicles.

During the course of the evaluation, we learned that OAS operated an Executive Driver Program at GSA Headquarters to transport Agency senior executives to and/or from GSA-related meetings and events in the Washington, D.C. area. The Executive Driver Program has existed since at least 2013 and has no published policy or procedure to ensure adequate utilization and efficiency of the program. We found that for FY 2019, the program was underutilized and OAS spent at least $83,425 operating the program in FY 2019. Using readily available commercial transportation services, GSA could reduce the annual costs of the Executive Driver Program, and could put at least $53,180 of funds to better use. Additionally, the Agency could achieve further savings by eliminating the third executive driver added to the Executive Driver Program in December FY 2020 costing $60,060 per option year of the contract.

Additionally, we found that the agency failed to implement operator safety requirements applicable to the two drivers assigned to the Executive Driver Program in FY 2019. GSA failed to comply with its responsibilities under its own regulations by being negligent in verifying driver's licenses and records for the two drivers of the program, not enforcing its contractual requirements, and compromising the safety of the program, drivers, and riders.

To address these findings, we recommended the following actions to the Chief Administrative Services Officer:

**1.** Evaluate the NCR internal fleet program's current utilization and establish a documented mechanism to remove underutilized vehicles from the inventory to ensure efficiency;

**2.** Evaluate the Executive Driver Program current usage against commercially available transportation sources and rates to balance needs and achieve cost savings beneficial to the Government;

**3.** Create procedures to identify GSA employees who are authorized to operate vehicles and ensure compliance with federal requirements for authorized operators, including the OAS employee serving as an Executive Driver Program driver; and

**4.** Enforce existing contract requirements for all drivers of the Executive Driver Program.



# SIGNIFICANT INVESTIGATIONS



# SIGNIFICANT INVESTIGATIONS

The Office of Investigations conducts independent and objective investigations relating to GSA programs, operations, and personnel. The office consists of special agents with full statutory law enforcement authority to make arrests, execute search warrants, serve subpoenas, and carry concealed weapons. Special agents conduct investigations that may be criminal, civil, or administrative in nature and often involve complex fraud schemes. Investigations can also involve theft, false statements, extortion, embezzlement, bribery, anti-trust violations, credit card fraud, diversion of excess government property, and digital crimes. During this reporting period, the office opened 50 investigative cases, closed 70 investigative cases, referred 93 subjects for criminal prosecution, and helped obtain 14 convictions. Civil, criminal, and other monetary recoveries resulting from our investigations totaled over $52 million.

# CRIMINAL INVESTIGATIONS

### GOVERNMENT CONTRACTOR ADMITS SCHEME TO INFLATE COSTS ON FEDERAL PROJECTS AND ANOTHER AGREES TO PAY $11 MILLION TO RESOLVE CRIMINAL AND CIVIL ALLEGATIONS RELATED TO BRIBERY AND KICKBACK SCHEME

A GSA OIG investigation found that over a 5-year period, Bhaskar Patel, a former senior project manager for Schneider Electric Building America, Inc. (Schneider), received more than $2.5 million in kickbacks in exchange for awarding work to subcontractors under Schneider's federal contracts. On December 2, 2020, Leonard Lebron Torres, President of Dynamic Solar Solutions, Inc., admitted to falsely inflating the expenses billed under their subcontract with Schneider to provide $422,080 in kickbacks to Patel, and he entered into an agreement to participate in an 18-month pretrial diversion program. On December 17, 2020, Schneider entered into a non-prosecution agreement with the Department of Justice in which it admitted to fraudulently charging the government for design costs on energy savings performance contracts they were not eligible to receive, and they agreed to pay nearly $1.63 million in criminal forfeiture. In addition, Schneider agreed to pay $9.37 million to settle False Claims Act and Anti-Kickback Act allegations related to Patel's scheme. Patel previously pleaded guilty for his role in the scheme and was sentenced on June 19, 2020, to three years' probation and ordered to pay a forfeiture of $2.56 million. Additionally, Reinaldo Cruz Taura, President of RCT Mechanical Engineering, pleaded guilty to providing over $1.2 million in kickbacks to Patel to obtain government subcontract work, and on July 2, 2020, he was sentenced to eight months' incarceration, two years' home confinement, five months' community service, and was required to pay $793,239 in restitution and a $10,000 fine. GSA OIG investigated this case with VA OIG, NCIS, USDA OIG, USCG, and the FBI.

Case 4:16-cv-02789-JSW    Document 48-8    Filed 11/01/21    Page 34 of 74

## FORMER GOVERNMENT EMPLOYEE CONVICTED ON THEFT OF GOVERNMENT FUNDS FOR USING THE GSA SHORT-TERM RENTAL PROGRAM FOR PERSONAL USE

A GSA OIG investigation found that over the course of two years, Edwin Torres Arenas, a former Department of Veterans Affairs (VA) employee, misused vehicles rented on behalf of the VA through GSA's Short-Term Rental (STR) program, resulting in a loss of $58,114. In addition to using the vehicles for his personal use, Arenas also loaned STR vehicles and their associated fuel cards to his family members for their personal use. Arenas and his family also incurred toll fees, which were billed to the VA. Arenas was sentenced to six months' home detention and three years' probation. He must also serve 30 days at the Alternative to Incarceration Program at the Brevard County's Sheriff work farm. Arenas was ordered to pay $58,144 in restitution and forfeit $58,114. GSA OIG investigated this case with VA OIG.

## THREE SENTENCED AND TWO SETTLEMENT AGREEMENTS REACHED IN FRAUD AND MONEY LAUNDERING SCHEME INVOLVING OVER $200 MILLION IN SMALL BUSINESS CONSTRUCTION CONTRACTS

A GSA OIG investigation found that Telemachos Agoudemos, co-owner of C3T, Inc., and Jorge Lopez, co-owner of Nuvo Construction Company, conspired with Brian Ganos, president of Sonag Company, Inc., and others to form Nuvo Construction Company and C3T, Inc. Ganos and his co-conspirators made false representations to the government in order to obtain set-aside construction contracts in the Milwaukee area valued at over $200 million. The contracts were issued under the U.S. Small Business Administration (SBA) 8(a), Department of Transportation Disadvantaged Business Enterprise, and Department of Veterans Affairs Service-Disabled Veteran-Owned Small Business (SDVOSB) set-aside programs. On October 20, 2020, Agoudemos was sentenced to time served. Agoudemos previously pleaded guilty to making a false statement. Agoudemos also agreed to turn over Thawzall construction equipment, to be auctioned by the U.S. Marshals Service, to settle allegations that he violated the False Claims Act. On December 3, 2020, Lopez was sentenced to two years' probation. Lopez previously pleaded guilty to conspiracy to defraud the United States. Also on December 3, 2020, Nuvo Construction Company was sentenced to a money judgment that imposed a forfeiture in the amount of $300,000. Nuvo Construction Company previously pleaded guilty to conspiracy to defraud the United States. Lastly, on March 19, 2021, Mark Spindler, who provided accounting services to Ganos and the companies he controlled, agreed to pay $102,500 to resolve covered conduct under the False Claims Act in his role to assist Ganos in making false representations. Spindler was previously found guilty of conspiring with Ganos and sentenced. GSA OIG investigated this case with the FBI, VA OIG, DOT OIG, SBA OIG, DCIS, Army CID, and DCAA.

## TWO INDIVIDUALS SENTENCED FOR ROLE IN A GOVERNMENT PURCHASE CARD FRAUD SCHEME

A GSA OIG investigation revealed Department of Energy (DOE) Western Area Power Administration (WAPA) employees conspired with WAPA contractors and acquaintances to make nearly $1 million in illicit government purchase card (GPC) purchases. The WAPA employees and contractors intentionally deleted warehouse supplies from the electronic inventory system and purported to replenish the items by making fictitious GPC purchases from companies created by the acquaintances. The investigation found the items were never removed from the warehouse shelves, and the supplies were never actually purchased. Maranda Fraze, Charles Branson, and Britini Branson each pleaded guilty to theft of government property for their role in the GPC fraud scheme. On November 4, 2020, Charles and Britini Branson were each sentenced — Charles to 180 days' home confinement, three years' probation, and $165,003 in restitution; and Britini to 90 days' home confinement, three years' probation, and $81,872 in restitution. Fraze was previously sentenced to four years' probation, 50 hours' community service, and ordered to pay restitution in the amount of $194,210. GSA OIG investigated this case with DOE OIG and the FBI.

## TWO EXECUTIVES PLEADED GUILTY IN SDVOSB FRAUD SCHEME

A GSA OIG investigation found that Eddie Lee, Chief Executive Officer, and Shaun Froelich, Chief Operating Officer, E-Corp, Inc., created a scheme to assume control of Raveco Enterprise, Inc., and use its legitimate SDVOSB status as a front for the formation of a joint venture to fraudulently obtain set-aside SDVOSB contracts. Lee and Froelich falsely certified in SAM, and to VA, that Raveco and its veteran owner earned the majority of the profits and made all decisions involving the joint venture. It was determined that Lee and Froelich excluded the veteran from all major business decisions, and provided false documentation to SBA related to the formation of the joint venture. As a result of the scheme, E-Corp received over $15 million in federal government contracts that it was not eligible to receive. In December 2020, both Froelich and Lee pleaded guilty to major fraud for their participation in the scheme. Both are awaiting sentencing. GSA OIG investigated this case with VA OIG, Army CID (MPFU), AFOSI, SBA OIG, and the FBI.

## AUTO BODY REPAIR BUSINESS OWNER PLEADED GUILTY AND WAS SENTENCED FOR FRAUDULENT CHARGES FOR REPAIR OF GOVERNMENT VEHICLE

A GSA OIG investigation found that Mark Kamranfar, owner of Federal Auto Body, fraudulently billed GSA for repairs to a GSA Fleet vehicle that were not completed. Kamranfar was charged with fraud by the Contra Costa County District Attorney's Office. On January 20, 2021, Kamranfar pleaded guilty to theft and was sentenced to 150 days' incarceration, 2 years' probation, 80 hours' community service, and was ordered to pay $23,491 in restitution. GSA OIG investigated this case with the California Bureau of Automotive Repair.

## VIRGINIA CONTRACTOR PLEADED GUILTY FOR ILLEGALLY SELLING CHINESE-MADE BODY ARMOR AND RELATED GOODS TO FEDERAL AGENCIES AND ILLEGAL POSSESSION OF A FIREARM

A GSA OIG investigation found that Arthur Morgan, owner and Chief Executive Officer of Surveillance Equipment Group (SEG) and its relative division, SEG Armor, falsely certified that the ballistic vests, helmets, riot gear, and other items he offered for sale under his federal contract were from designated countries, specifically, Hong Kong and the United States. In fact, Morgan sourced items totaling approximately $650,000 on at least 11 orders placed between September 2014 and August 2019 from China, in violation of the Trade Agreements Act (TAA), and he falsely certified they were made in TAA-compliant countries. During the execution of search warrants at Morgan's properties, agents recovered multiple firearms, ammunition, and high capacity magazines along with ballistic vests, plates, and helmets. At the time that Morgan possessed the firearms, ammunition, and body armor, he had been convicted of second-degree murder; assault with the intent to murder, rape or rob; and use of a handgun in a crime of violence. As a result of his conviction, he was prohibited from possessing the firearms, ammunition, and ballistic armor. On December 18, 2020, Morgan pleaded guilty to charges of wire fraud and being a prohibited person in possession of a firearm. Morgan is awaiting sentencing. GSA OIG investigated this case with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Army CID (MPFU), DCIS, NCIS, Department of State OIG, HSI, AFOSI, and the FBI.

## PROJECT MANAGER PLEADED GUILTY TO CONSPIRACY TO VIOLATE THE ANTI-KICKBACK STATUTE AND WIRE FRAUD

As previously reported, Alutiiq International Solutions, LLC (Alutiiq), signed a non-prosecution agreement with the Department of Justice and agreed to pay GSA over $1.25 million to resolve allegations that former Alutiiq Project Manager Elmer "Butch" Baker engaged in a kickback and fraud scheme on a U.S. government construction contract administered by GSA. During the investigation, it was determined that in or around 2015, Baker began demanding kickbacks from Alutiiq's subcontractor, Capital Contracting, Inc. (Capital Contracting), in the form of meals, golf sessions, vacations, and other things of value that equated to approximately 10 percent of the amount of each subcontract modification that Baker awarded to Capital Contracting. Additionally, after receiving subcontract estimates from Capital Contracting, Baker illegally inflated the estimates prior to submitting them to GSA. Over the course of several subcontract modifications, Baker defrauded GSA out of approximately $1.25 million issued between 2015 and 2018. On November 19, 2020, Baker pleaded guilty to conspiracy to violate the Anti-Kickback Statute and wire fraud and is currently awaiting sentencing. GSA OIG investigated this case with Department of State OIG, Army CID (MPFU), and the FBI.

## FORMER GSA CONTRACT SPECIALIST SENTENCED FOR BRIBERY SCHEME

A GSA OIG investigation found that Ronnie Simpkins, a former GSA Senior Contracting Officer, accepted cash, meals, and furniture totaling over $12,000 from a GSA schedule vendor in return for approving their contract and advising the vendor on how to avoid contract cancellation, despite failing to meet GSA program requirements. Simpkins was the GSA contracting officer for the vendor's GSA schedule contracts for 13 years. On October 6, 2020, Simpkins was sentenced to 21 months' incarceration, followed by 12 months' supervised release; and fined $10,000 for his involvement in the scheme. GSA OIG investigated this case with DCIS and the FBI.

Case 4:16-cv-02789-JSW    Document 48-8    Filed 11/01/21    Page 38 of 74

## CONTRACTOR PLEADED GUILTY TO LYING TO FEDERAL INVESTIGATORS DURING SDVOSB FRAUD INVESTIGATION

A GSA OIG investigation found that Troy Bechtel, former Project Manager for United Medical Design Builders (UMDB), lied to investigators when questioned about UMDB's eligibility to receive SDVOSB set-aside contracts. The investigation determined UMDB fraudulently obtained $45.7 million in U.S. Army Corps of Engineers SDVOSB set-aside construction contracts it was not eligible to receive. Previously, Bechtel was charged with major program fraud, for his alleged role in the set-aside scheme, and making false statements to investigators. On December 17, 2020, Bechtel pleaded guilty to the false statement charge and is currently awaiting sentencing. GSA OIG investigated this case with DCIS, Army CID (MPFU), and SBA OIG.

## TWO CONSTRUCTION COMPANY OWNERS PLEADED GUILTY AND ONE INDICTED RELATED TO SCHEME TO DEFRAUD SDVOSB PROGRAM

A GSA OIG investigation found that Ruben Villarreal, Michael Wibracht, and other co-conspirators, conspired to defraud the United States in order to obtain valuable government contracts under programs administered by the SBA for which neither of their companies were eligible to receive. As part of this scheme, the conspirators installed Villarreal, a service-disabled veteran, as the ostensible owner of a general construction company held out as a SDVOSB. Wibracht and other co-conspirators, however, exercised disqualifying financial and operational control over the construction company. They concealed the control in order to secure over $250 million in government contracts with various agencies, including GSA, that were "set aside" for SDVOSBs in order to benefit their larger, non-qualifying businesses. On February 12, 2021, Wibracht pleaded guilty to conspiracy to defraud the United States. On November 20, 2020, Villarreal also pleaded guilty to conspiracy to defraud the United States. Both are awaiting sentencing. On March 17, 2021, a co-conspirator was indicted on conspiracy to commit wire fraud, and wire fraud. GSA OIG investigated this case with SBA OIG, VA OIG, DCIS, Army CID (MPFU), and Army Audit Agency.

# CIVIL SETTLEMENTS

### COGNOSANTE, LLC. AGREEED TO PAY $18.9M TO RESOLVE FALSE CLAIMS ALLEGATIONS

On November 20, 2020, Cognosante, LLC, agreed to pay the United States $18.98 million to resolve allegations that it violated the False Claims Act by using unqualified labor and overcharging the United States for services provided to government agencies under two GSA contracts. GSA OIG investigated this case with the U.S. Attorney's Office for the District of Columbia, and the DOJ Civil Division's Commercial Litigation Branch.

### WORKRITE ERGONOMICS, LLC. AGREEED TO PAY $7.1M TO RESOLVE FALSE CLAIMS ALLEGATIONS

On November 30, 2020, Workrite Ergonomics, LLC, entered into a civil settlement with the Department of Justice to resolve False Claims Act allegations. Workrite allegedly made false disclosures and statements, including commercial sales price disclosures, and violated the Price Reduction Clause by failing to give required discounts to government customers, resulting in overcharges to the federal government. Workrite agreed to pay $7.1 million, plus $412,356 in interest, over four years and four months. GSA OIG investigated this case with GSA OIG Office of Audits, DCIS, Department of State OIG and VA OIG.

### SAP PUBLIC SERVICES, INC. TO PAY $2.2 MILLION TO SETTLE FALSE CLAIMS ACT ALLEGATIONS

On February 22, 2021, SAP Public Services, a subsidiary of the multinational software engineering and support company SAP SE, agreed to pay $2.2 million to resolve allegations under the False Claims Act that SAP Public Services failed to pay the industrial funding fees it owed to GSA, and that it did not always provide the appropriate contractual discounts and required staffing on task and delivery orders.

## ALMONT GROUP INC. OWNER AGREED TO $348,000 SETTLEMENT TO RESOLVE FALSE CLAIMS ALLEGATIONS

A GSA OIG investigation found that from 2013 through 2018, Bernard Klein, owner of the Almont Group Inc., conspired with Ramin Kohanbash, owner of California Surplus, Inc., FR-HQ LLC, and Gan Eden LLC, and a GSA contractor to manufacture counterfeit military uniforms and gear in China and Pakistan. The uniforms and gear were sold to the Department of Defense through the GSA Advantage online ordering system, in violation of both the Berry Amendment and the Trade Agreements Act. On November 18, 2020, Klein agreed to pay $348,000 to settle a claim under the False Claims Act. Klein and Kohanbash pleaded guilty to conspiracy to commit wire fraud for their role in the scheme, and they are awaiting sentencing. In addition, Klein, Kohanbash, and their businesses were indefinitely suspended from federal procurements. OIG investigated the case with DCIS, DHS HSI, and AFOSI.

## TIME ENTERPRISES AGREED TO PAY $120K TO RESOLVE FALSE CLAIMS ALLEGATIONS

GSA OIG investigated allegations that Time Enterprises submitted false claims for payment to U.S. Government agencies and charged for name brand OEM printer cartridges when, in fact, Time supplied lower cost, compatible, non-OEM cartridges to federal customers. On March 18, 2021, Time and its owner, Michael Lowe, agreed to pay $120,000 to resolve the allegations. GSA OIG investigated this case with DCIS.

## COMPANY EXECUTIVE AGREED TO PAY $35,000 TO RESOLVE FALSE CLAIMS ALLEGATIONS

On October 27, 2020, Kelly O'Donnell, owner of AGS Enterprises, Inc., and its subsidiaries KLN Steel Products Co., LLC, Furniture by Thurston, Inc., and Dehler Manufacturing, Inc., agreed to pay $35,000 to resolve allegations under the False Claims Act that the companies violated laws related to bidding for and performing under federal contracts. Specifically between 2009 and 2016, O'Donnell allegedly made false certifications regarding the companies' sales of goods that were not compliant with the Trade Agreements Act and the Buy American Act, made false certifications related to place of manufacture of products in connection with its GSA contracts, and submitted false invoices for freight charges. GSA OIG investigated this case with Army CID.

# INVESTIGATIONS OF SENIOR GOVERNMENT EMPLOYEES

## ALLEGATIONS AGAINST FORMER SENIOR GOVERNMENT EMPLOYEE SUBSTANTIATED

The GSA OIG initiated an investigation into allegations that a former Customs and Border Protection (CBP) Program Manager who was member of a GSA Selection Evaluation Board for a GSA contract, may have violated the Procurement Integrity Act. The GSA contract was valued at over $130 million and covered a major construction project at a Port of Entry (POE) on the southern border. The investigation disclosed that within one month after the contract was awarded, the Program Manager retired from CBP and began working for the company that received the contract, and he was specifically assigned to the POE project. After concerns were raised by GSA procurement officials and CBP counsel, the Program Manager stopped working directly for the prime contractor and instead began working for one of their subcontractors while still performing similar work on the POE project. This case was referred to the Department of Justice in December 2017 and declined for criminal prosecution in February 2021.

## ALLEGATIONS AGAINST SENIOR GOVERNMENT EMPLOYEE NOT SUBSTANTIATED

GSA OIG initiated an investigation into allegations that a senior government employee engaged in time and attendance abuse. The allegations were not substantiated.

# FLEET CARD FRAUD

During this reporting period, we continued to investigate Fleet card cases. Notable cases include:

- A Specialist in the United States Army, Fort Polk, Louisiana, received an other-than-honorable discharge from the U.S. Army under a Chapter 10 administrative separation, in lieu of a criminal trial by court-martial. The Specialist admitted guilt related to the theft and misuse of a GSA Fleet credit card after a GSA OIG investigation determined he utilized the card to purchase fuel for his personal vehicle, as well as the personal vehicles of others. Subsequent to separation, the Specialist was ordered to pay restitution of $5,400.

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 42 of 74

- Corporal Christian M. Epps and a lance corporal in the United States Marine Corps, Camp Pendleton, CA, were charged with violations of the Uniformed Code of Military Justice (UCMJ) for their respective roles in a scheme to steal GSA Fleet credit cards. On January 15, 2021, Corporal Epps was charged with two violations of the UCMJ, including conspiracy and fraudulent use of a Fleet card. On February 18, 2021, he pleaded guilty to both charges at a Special Courts Martial. He was sentenced to a bad conduct discharge, reduced in rank to E-1, ordered to forfeit $5,400, pay a fine of $200, and he will be confined for 100 days (concurrent) on each charge. On January 22, 2021, the lance corporal was charged with conspiracy. GSA OIG investigated this case with the USMC CID.

- A Gunnery Sergeant assigned to the United States Marine Corp Recruiting Station, Tyler, Texas, entered into a pretrial diversion agreement after a GSA OIG investigation determined the Gunnery Sergeant utilized a GSA Fleet credit card to purchase diesel fuel for his personal benefit. He was ordered to pay restitution of $1,556 and perform 80 hours' community service.

- Richard Oregel was indicted, arrested, and pleaded guilty for his role in a scheme to use multiple GSA Fleet credit cards to purchase fuel for personal vehicles, steal identities, and possess unauthorized access devices during the commission of crimes in the Central District of California. On January 7, 2021, Oregel was sentenced to two years' probation and restitution of $126 for his role in the scheme. GSA OIG investigated this case with USPIS, DCIS, and VA OIG.

- A Sergeant First Class in the Maryland Army National Guard was separated from the Active Guard Reserve program following a GSA OIG investigation into her misuse of government-owned vehicles and GSA Fleet credit cards for personal gain.

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 43 of 74

# WPA ART INVESTIGATIONS

As a direct result of the cooperative efforts between the OIG and the GSA Office of the Chief Architect's Fine Arts Program (FAP), 11 lost pieces of Works Progress Administration (WPA) artwork were reclaimed and inventoried during this reporting period. These pieces of American history are not subject to public sale, but their comparative value totals $85,000. Additionally, we filed a civil complaint to recover an additional piece of art. The FAP will be conserving the pieces before placing them on loan to institutions across the country for display.

Since cooperative efforts between the OIG and FAP began in 2001, a total of 783 WPA pieces have been recovered, with a comparative value of $8,716,350.[1]

- On November 3, 2020, GSA OIG special agents recovered 10 WPA works of art originally loaned to the San Francisco Housing Authority after learning about them from an anonymous complainant. The works of art have an estimated value of $80,000.

- On February 8, 2021, GSA OIG special agents recovered the WPA painting, "A Spot in Bethlehem," by Ralph Nelson, after learning that it was being auctioned. The painting has an estimated value of $5,000.

- On February 18, 2021 , a civil complaint was filed against an individual to recover the WPA painting, "Political Editorial," by Mitchell Siporin. The United States alleges that the individual converted the painting for his personal gain and refused to return it to the U.S. Government. The individual had attempted to sell the painting on eBay for $35,000.

---

1   This number includes all pieces of artwork recovered through the joint publicity/recovery efforts of the OIG and FAP. Not all recoveries require direct intervention by the OIG; some are "turn-ins" as a result of publicity or Internet searches that reveal the government's ownership.

# OTHER SIGNIFICANT WORK

## SUSPENSION AND DEBARMENT INITIATIVE

GSA has a responsibility to ascertain whether the people or companies it does business with are eligible to participate in federally assisted programs and procurements, and that they are not considered "excluded parties." Excluded parties are declared ineligible to receive contracts by a federal agency. The FAR authorizes an agency to suspend or debar individuals or companies for the commission of any offense indicating a lack of business integrity or business honesty that directly affects the present responsibility of a government contractor or subcontractor. The OIG has made it a priority to process and forward referrals to GSA, so GSA can ensure that the government does not award contracts to individuals or companies that lack business integrity or honestly.

During this reporting period, the OIG made 78 referrals for consideration of suspension or debarment to the GSA Office of Acquisition Policy or other federal debarment officials. There were 114 actions issued based on current and previous OIG referrals.

## INTEGRITY AWARENESS

The OIG presents Integrity Awareness Briefings nationwide to educate GSA employees on their responsibilities for the prevention of fraud and abuse. This period, we presented 31 briefings attended by 1083 GSA employees, other government employees, and government contractors. These briefings explain the statutory mission of the OIG and the methods available for reporting suspected instances of wrongdoing. In addition, through case studies, the briefings make GSA employees aware of actual instances of fraud in GSA and other federal agencies and thus help to prevent their recurrence. GSA employees are the first line of defense against fraud, abuse, and mismanagement. They are a valuable source of investigative information.

## HOTLINE

The OIG hotline provides an avenue for employees and other concerned citizens to report suspected wrongdoing. Hotline posters located in GSA controlled buildings encourage employees to use the hotline. Our hotline also allows internet submission of complaints. During the reporting period, we received 1307 hotline contacts. Of these, 38 were referred to GSA program officials for review and appropriate action, 9 were referred to other federal agencies, 23 were referred to the OIG Office of Audits, 1 was referred to the OIG Office of Inspections, 1 was referred to the OIG Office of Counsel, and 44 were referred to investigative field offices for investigation or further review.

# STATISTICAL SUMMARY OF OIG INVESTIGATIONS

**October 1, 2020 – March 31, 2021**

| OFFICE OF INVESTIGATIONS | |
|---|---|
| Referrals for criminal prosecution, civil litigation, administrative action, suspension & debarment | 217 |
| Indictments and informations on criminal referrals* | 29 |
| Subjects accepted for criminal prosecution | 71 |
| Subjects accepted for civil action | 11 |
| Convictions | 14 |
| Civil settlements/judgments | 9 |
| Contractors/individuals suspended and debarred | 114 |
| Employee actions taken on administrative referrals involving government employees | 8 |
| Investigative Reports** | 11 |
| Number of subpoenas | 48 |
| Civil settlements and court-ordered and investigative recoveries | $52,754,168 |

\*   The total number of criminal indictments and criminal informations include all criminal charging documents resulting from any prior referrals to prosecutive authorities.

\*\*  The total number of investigative reports include reports of investigations and letterhead reports, which summarize the results of, or information obtained during, an investigation and were referred to GSA officials for a response in consideration of taking administrative action or for information only.

## Investigative Workload

The OIG opened 50 investigative cases and closed 70 cases during this period.

## Referrals

The OIG makes criminal and civil referrals to the Department of Justice (DOJ) or other authorities for prosecutive and litigative consideration. The OIG also makes administrative referrals to GSA officials on certain cases disclosing wrongdoing on the part of GSA employees, contractors, or private individuals doing business with the government.

## Actions on OIG Referrals

Based on these and prior referrals, 71 subjects were accepted for criminal prosecution and 11 subjects were accepted for civil litigation. Criminal cases originating from OIG referrals resulted in 29 indictments or informations and 14 convictions. OIG civil referrals resulted in 9 subject settlements/judgments. Based on OIG administrative referrals, GSA management debarred 52 contractors or individuals, suspended 62 contractors or individuals, and took 8 personnel actions against government employees.

**Table 4. Summary of OIG Referrals**

| TYPE OF REFERRAL | CASES | SUBJECTS |
|---|---|---|
| Civil | 13 | 23 |
| Criminal (DOJ)* | 40 | 80 |
| Criminal (State/Local)** | 6 | 13 |
| Administrative Referrals for Action/Response | | 23 |
| Suspension | 5 | 10 |
| Debarment | 14 | 68 |
| TOTAL | 78 | 217 |

\* The total number of persons referred to DOJ for criminal prosecution includes both individuals and companies which have been referred to DOJ for criminal prosecutorial consideration.

\** The total number of persons referred to state and local authorities includes both individuals and companies which have been referred to authorities, other than DOJ, for criminal prosecution. Referrals to military authority for prosecution under the Uniform Code of Military Justice are also included in this metric.

## Monetary Results

Table 5 presents the amounts of fines, penalties, settlements, recoveries, forfeitures, judgments, and restitutions payable to the U.S. government as a result of criminal and civil actions arising from OIG referrals. Table 6 presents the amount of administrative recoveries and forfeitures as a result of investigative activities. Criminal, civil, and other monetary recoveries arising from our work totaled more than $52 million.

**Table 5. Criminal and Civil Results**

|  | CRIMINAL | CIVIL |
|---|---|---|
| Fines and Penalties | $10,200 |  |
| Settlements |  | $38,676,937 |
| Recoveries/Forfeitures | $12,392,504 | $0 |
| Restitutions | $377,648 |  |
| **TOTAL** | **$12,780,352** | **$38,676,937** |

**Table 6. Non-Judicial Recoveries\***

| | |
|---|---|
| Administrative Recoveries | $1,296,879 |
| Forfeitures/Restitution | $0 |
| **TOTAL** | **$1,296,879\*** |

\*    This total includes the FAR disclosures reported on page 18.



Since 2001, GSA OIG has worked with the agency's Fine Arts Program to recover for the federal government more than 700 pieces of Works Progress Administration (WPA) artwork with a comparative value of more than $8 million.

# GOVERNMENT-WIDE POLICY ACTIVITIES

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 50 of 74

# GOVERNMENT-WIDE POLICY ACTIVITIES

Section 4(a)2 of the Inspector General Act requires us to review existing and proposed legislation and regulations relating to programs and operations of GSA and to make recommendations in the semiannual report concerning the impact of such legislation or regulations on the economy and efficiency in the administration of programs and operations administered or financed by GSA or the prevention and detection of fraud and abuse in such programs and operations.

- **FAR Case 2015-038, Proposed Rule, Reverse Auctions.** On February 5, 2021, GSA OIG submitted comments on the proposed rule to amend the Federal Acquisition Regulation (FAR) concerning reverse auctions. GSA OIG expressed significant concerns with regard to the proposed language outlined in proposed FAR 17.802(d)(5)(iii) that reverse auction service providers must remove "all documentation received from offerors in response to the reverse auction from its business and computer systems" at the close of each auction. The proposed requirement to purge all documentation would undermine access to comprehensive information and data required to complete GSA OIG investigations, evaluations, and audits to identify fraud, waste, and abuse within the reverse auction platform.

## Interagency and Intra-agency Committees and Working Groups

- **Council of the Inspectors General on Integrity and Efficiency (CIGIE).** The IG is a member of the Budget, Investigations, and Legislation Committees. Through CIGIE, we also participate in the following:

  - **Federal Audit Executive Council Information Technology Committee.** The Office of Audits participates in the Federal Audit Executive Council (FAEC) IT Committee. This committee provides a forum to share information and coordinate audits of significant IT issues with the OIG community and the federal government. The committee also develops and recommends best practices to be used by OIGs in addressing IT issues.

  - **Federal Audit Executive Council Digital Accountability and Transparency Act Working Group.** The Office of Audits participates in the FAEC Digital Accountability and Transparency Act (DATA Act) working group. The working group's mission is to assist the OIG community in understanding and meeting its DATA Act oversight requirements by: (1) serving as a working level liaison with the Department of the Treasury, (2) consulting with the GAO, (3) developing a common review approach and methodology, and (4) coordinating key communications with other stakeholders. The Office of Audits participates to stay abreast of the latest DATA Act developments in order to monitor GSA's implementation of the DATA Act.

  - **Federal Audit Executive Council Contracting Committee.**

The Office of Audits participates in the FAEC Contracting Committee. The committee is involved with addressing contract, program, and acquisition management issues that have common interest throughout the OIG community. The committee shares information on audit topics, successful audits, and related techniques.

– **Enterprise Risk Management Working Group.** The Office of Audits participates in CIGIE's Enterprise Risk Management (ERM) working group. The working group's mission is to contribute to the promotion and implementation of ERM principles in accordance with OMB Circular A-123 within OIGs and their respective agencies. The Office of Audits participates in the working group as a part of a collaborative effort with other OIGs to oversee the sharing of processes and best practices used to analyze, prioritize, and address risks identified and relevant to implementing ERM in the federal government.

– **Disaster Assistance Working Group.** In response to the damage caused by Hurricanes Harvey, Irma, and Maria, CIGIE reactivated the Disaster Assistance Working Group to coordinate the OIG community's oversight of the federal response and recovery efforts as well as the resources appropriated by Congress for disaster recovery programs. The Office of Audits participates in the Disaster Assistance Working Group to identify any overlapping issues and coordinate any related work.

– **Pandemic Response and Accountability Committee.** The Office of Audits participates in CIGIE's Pandemic Response and Accountability Committee. The government's coronavirus response includes $2.6 trillion in economic relief to individual citizens, loans for businesses, and support for hospitals and other medical providers, as well as economic relief for affected businesses; industries; and state, local, and tribal governments. The Pandemic Response and Accountability Committee's mission is to promote transparency and ensure coordinated, comprehensive oversight of the government's spending and coronavirus response to prevent and detect fraud, waste, abuse, and mismanagement.

– **Geospatial Data Act Working Group.** The Office of Audits participates in the Geospatial Data Act of 2018 (GDA) working group. The working group's mission is to assist the OIG community in understanding and meeting its GDA oversight requirements by: (1) consulting with the Federal Geospatial Data Committee, (2) developing a common review approach and methodology, and (3) coordinating key communications with other stakeholders. The Office of Audits participates to stay abreast of the latest GDA developments in order to monitor GSA's compliance with GDA requirements.

— **Data Analytics Working Group.** The Office of Investigations participates in the CIGIE Data Analytics Working Group. The working group's projects include developing training forums in data analytics, updating a repository of databases and other sources of information used by the OIG community, and identifying cross-cutting initiatives using data analytics to detect fraud.

— **Blue Book Working Group.** The Office of Inspections participates in the Blue Book Working Group. The working group is composed of Inspection and Evaluation (I&E) professionals from the IG Community who published the *CIGIE Quality Standards for Inspection and Evaluation* (Blue Book) in December 2020.

— **Inspection and Evaluation Peer Review Working Group.** The Office of Inspections participates in the Inspection and Evaluation (I&E) Peer Review Working Group. The working group is comprised of I&E professionals from the IG Community that published the Guide for Conducting Peer Reviews of Inspection and Evaluation Organizations of Federal Offices in December 2020. Currently, the working group is updating the Guide for Conducting Peer Reviews of Inspection and Evaluation Organizations of Federal Offices to coincide with the new Blue Book published in December 2020.

— **Inspection and Evaluation Roundtable.** The Office of Inspections participates in the Inspection and Evaluation (I&E) Roundtable. The Roundtable provides a forum to share information and coordinate issues of importance with the OIG inspections and evaluations community.

— **Investigations Training Subcommittee.** The Office of Investigations participates in the CIGIE Investigations Training Subcommittee. The subcommittee establishes and promotes training resources for investigative staff throughout the OIG community.

# APPENDIXES

# APPENDIX I
# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **AFOSI** | Air Force Office of Special Investigations |
| **Army CID** | U.S. Army Criminal Investigation Division |
| **CBP** | Customs and Border Protection |
| **CIGIE** | Council of the Inspectors General on Integrity and Efficiency |
| **COR** | contracting officer's representative |
| **CSP** | Commercial Sales Practices |
| **DATA Act** | Digital Accountability and Transparency Act of 2014 |
| **DCAA** | Defense Contract Audit Agency |
| **DCIS** | Defense Criminal Investigative Service |
| **DHS** | Department of Homeland Security |
| **DOE** | Department of Energy |
| **DOJ** | Department of Justice |
| **DOL** | Department of Labor |
| **DOT** | Department of Transportation |
| **ERM** | Enterprise Risk Management |
| **FAEC** | Federal Audit Executive Council |
| **FAP** | Fine Arts Program |
| **FAR** | Federal Acquisition Regulation |
| **FAS** | Federal Acquisition Service |
| **FBI** | Federal Bureau of Investigation |
| **FSS** | Federal Supply Schedule |
| **FY** | Fiscal Year |
| **GAO** | Government Accountability Office |
| **GDA** | Geospatial Data Act of 2018 |
| **GSA** | General Services Administration |
| **HSI** | Homeland Security Investigations |
| **IRS-CI** | Internal Revenue Service Criminal Investigation Division |
| **IT** | Information Technology |
| **ITP** | Insider Threat Program |
| **MPFU** | Major Procurement Fraud Unit |
| **NCIS** | Naval Criminal Investigative Service |
| **NCR** | National Capital Region |
| **OIG** | Office of Inspector General |
| **OAS** | Office of Administrative Services |
| **OMB** | Office of Management Budget |
| **OPM** | Office of Personnel Management |
| **OSHA** | Occupational Safety and Health Administration |
| **PBS** | Public Buildings Service |
| **PIV** | Personal Identity Verification |
| **SAM** | System for Award Management |
| **SBA** | Small Business Administration |
| **SDVOSB** | Service-Disabled Veteran-owned Small Business |
| **TAA** | Trade Agreements Act |
| **USCG** | United States Coast Guard |
| **USDA** | U.S. Department of Agriculture |
| **USPIS** | U.S. Postal Inspection Service |
| **VA** | U.S. Department of Veterans Affairs |
| **WPA** | Works Progress Administration |

# APPENDIX II
# SIGNIFICANT RECOMMENDATIONS
# FROM PRIOR REPORTS

The GSA Office of the Chief Financial Officer, Office of Audit Management and Accountability is responsible for tracking the implementation of audit and inspection recommendations after a management decision has been reached, and thus furnished the following status.

Prior Semiannual Reports to the Congress included 12 reports with recommendations that have not yet been fully implemented. These recommendations are currently being implemented in accordance with established milestones.

### AUDIT OF THE PUBLIC BUILDINGS SERVICE'S GREEN ROOF MAINTENANCE AND SAFETY PRACTICES

**Period First Reported: April 1, 2020, to September 30, 2020**

Our audit objectives were to determine whether PBS: (1) has a maintenance strategy in place to protect its green roof inventory investment and (2) provides fall protection in accordance with internal guidance and federal regulations. We made six recommendations; one has not been implemented.

The remaining recommendation involves developing a comprehensive strategy to ensure that PBS maintains its green roof inventory in accordance with internal guidance and industry standards. The recommendation is scheduled for completion by July 30, 2021.

### AUDIT OF THE GSA PUBLIC BUILDINGS SERVICE'S USE OF CONSTRUCTION MANAGEMENT SERVICES

**Period First Reported: April 1, 2020, to September 30, 2020**

Our audit objectives were to determine whether PBS has effective internal controls to: (1) prevent construction management firms from performing inherently governmental or prohibited services as defined by Office of Management and Budget policy and the Federal Acquisition Regulation and (2) avoid organizational conflicts of interest that may bias a construction management firm's judgment or provide an unfair competitive advantage. We made two recommendations, which have not been implemented.

The recommendations involve PBS performing a review and taking corrective actions for all current construction management and general construction contracts and implementing controls for future construction management and general construction contracts to ensure that: qualified PBS personnel are performing the required review prior to approving government estimates prepared by non-government personnel; non-government personnel do not perform inherently governmental functions; PBS contracting officers identify, evaluate, and mitigate potential organizational conflicts of interests before contract award and during performance; access to competitors' proprietary information and government data is limited to government personnel whose official duties require that knowledge; and PBS personnel do not award services prohibited under the GSA's Professional Engineering Services Schedule. The recommendations are scheduled for completion by August 31, 2021.

## GSA NEEDS TO MORE EFFECTIVELY MANAGE ITS WORKERS' COMPENSATION PROGRAM

**Period First Reported: April 1, 2020, to September 30, 2020**

Our objective was to determine if GSA effectively managed its workers' compensation program to reduce its costs by: (1) submitting claims accurately and on time, (2) maintaining case files and monitoring claims to ensure injured employees returned to work, and (3) ensuring the accuracy of chargeback costs. We made five recommendations, which have not been implemented.

The recommendations involve reviewing, revising, and implementing policies and procedures to more effectively manage GSA's workers' compensation cases; reviewing, revising, and implementing case monitoring policies and procedures to ensure that workers' compensation specialists provide timely responses to inquiries and questions from the U.S. Department of Labor (DOL) regarding workers' compensation cases, review forms from DOL to ensure accuracy and completeness, and request additional information or further review from DOL on questionable cases; reviewing and revising policies and procedures to include a process for assessing cases where employees have not returned to work to determine appropriate follow-up actions, and maintaining contact with claimants to monitor their status and assist in returning them to work when medically capable; developing and implementing a process to verify the accuracy of the DOL chargeback reports; and determining if employees receiving workers' compensation benefits were part of a GSA function transferred to another agency and requesting DOL to remove transferred employees from GSA's chargeback report and recover the associated payments, if allowable. The recommendations are scheduled for completion by December 31, 2021.

## AUDIT OF COMPETITION IN THE PUBLIC BUILDINGS SERVICE'S NATIONAL CAPITAL REGION CONTRACTS

**Period First Reported: April 1, 2020, to September 30, 2020**

The objectives of our audit were to determine if PBS NCR is: (1) meeting its goals for contract competition rates and number of one-bid proposals and (2) adhering to competition requirements in the Federal Acquisition Regulation to ensure the government is getting fair and reasonable pricing. We made three recommendations, which have not been implemented.

The recommendations involve establishing controls to ensure that decisions to forgo competition, both in the acquisition plan and justification documentation, are reviewed and approved at the appropriate level; ensuring that contracting staff are taking the appropriate steps to award contracts at fair and reasonable prices, and that reasonable price determinations are documented in contract files; and establishing controls to ensure that Federal Procurement Data System-Next Generation data is input accurately and reviewed for accuracy. The recommendation is scheduled for completion by April 30, 2021.

## AUDIT OF GSA'S COMPLIANCE WITH THE GEOSPATIAL DATA ACT OF 2018

**Period First Reported: April 1, 2020, to September 30, 2020**

Our objective was to assess GSA's implementation of the requirements set forth in the Geospatial Data Act of 2018. Specifically, we evaluated GSA's compliance with the 13 requirements under Section 759(a). We made two recommendations; one has not been implemented.

The remaining recommendation involves establishing effective internal controls to ensure oversight responsibilities are assigned and procedures related to data and metadata quality are implemented, effective, and consistently followed. The recommendation is scheduled for completion by August 31, 2021.

## AUDIT OF GSA'S FISCAL YEAR 2019 TRAVEL CARD PROGRAM

**Period First Reported: April 1, 2020, to September 30, 2020**

The objectives of our audit were to determine if, in Fiscal Year 2019: (1) GSA's travel card program had controls in place to ensure compliance with GSA, Office of Management and Budget, and federal guidelines; and (2) GSA travel card transactions were properly and fully supported, reported, and approved. We made two recommendations; one has not been implemented.

The remaining recommendation involves strengthening controls to ensure that delinquent travel card accounts are resolved. The recommendation is scheduled for completion by April 30, 2021.

Case 4:16-cv-02789-JSW    Document 48-8    Filed 11/01/21    Page 58 of 74

## THE FEDERAL ACQUSITION SERVICE'S REPORTING OF SMALL BUSINESS PROCUREMENTS CONTAINED SIGNIFICANT INACCURACIES

**Period First Reported: April 1, 2020, to September 30, 2020**

Our objective was to determine if the Federal Acquisition Service properly identifies and reports small business procurements in accordance with the Federal Acquisition Regulation. We made two recommendations; one has not been implemented.

The remaining recommendation involves addressing the Federal Procurement Data System-Next Generation limitations to ensure that contracting officers can accurately identify, and the data will accurately reflect, small business procurements. The recommendation is scheduled for completion by June 30, 2021.

## AUDIT OF PUBLIC BUILDINGS SERVICE'S PHOTOVOLTAIC INSTALLATIONS IN THE NEW ENGLAND AND NORTHEAST AND CARIBBEAN REGIONS

**Period First Reported: October 1, 2019, to March 31, 2020**

Our objectives were to determine whether PBS in the New England and Northeast and Caribbean Regions: (1) is collecting and reporting accurate power generation numbers from its photovoltaic (PV) installations to ensure data integrity, (2) is properly maintaining and inspecting its PV installations to ensure effective and continued operations, and (3) took advantage of rebates that were available at the time of its various PV installations in order to minimize installation costs. We made four recommendations, which have not been implemented.

The recommendations involve developing and implementing policies and procedures to ensure that PV power generation data is consistent, reliable, and supported; directing regional management to develop a directive for building personnel to track and collect PV readings directly from the equipment and for officials in the Energy and Utilities Branch to verify those readings with the corrected advanced metering system; directing regional management to implement and reinforce the instructions for monthly tracking of PV power generation readings set forth in its January 17, 2018, memorandum; and directing regional management to ensure property management is aware of and enforces the semiannual maintenance and inspection requirements for the PV installations. The recommendations are scheduled for completion by April 30, 2021.

## GSA'S NORTHEAST AND CARIBBEAN REGION LACKS POLICIES AND PROCEDURES FOR EMERGENCIES AND EVACUATIONS IN PUERTO RICO

**Period First Reported: April 1, 2019, to September 30, 2019**

Our objectives were to determine whether: (1) the Northeast and Caribbean Region has policies and procedures in place to effectively respond to disasters in Puerto Rico and (2) all supply and equipment distributions for and travel and subsistence payments made to and on behalf of GSA employees are accounted for, supported, and justified. We made four recommendations; one has not been implemented.

The remaining recommendation involves coordinating the development of policies and procedures for emergencies and evacuations in all areas where GSA has a presence based on lessons learned and applicable federal regulations. The recommendation is scheduled for completion by June 30, 2021.

## GSA'S PUBLIC BUILDINGS SERVICE DOES NOT TRACK AND REPORT ALL UNUSED LEASED SPACE AS REQUIRED

**Period First Reported: April 1, 2018, to September 30, 2018**

Our objectives were to determine whether: (1) PBS accurately reports the amount of vacant and unused leased space and (2) PBS's controls for managing unused leased space are effective in preventing and reducing undue costs to the government. We made two recommendations; one has not been completed.

The remaining recommendation involves developing and implementing a process to ensure that PBS reports and mitigates all unused space for all non-cancelable occupancy agreements in its lease portfolio. The recommendation is scheduled for completion by May 31, 2021.

## GSA OFFICE OF MISSION ASSURANCE 2018 EAGLE HORIZON EXERCISE RESULTS DID NOT PROPERLY REFLECT AGENCY'S STATE OF READINESS

**Period First Reported: April 1, 2020, to September 30, 2020**

Our objective was to determine whether GSA planned, conducted, and reported on the 2018 Eagle Horizon exercise in accordance with federal and GSA policies and principles. We made two recommendations, which have not been implemented.

The two recommendations involve: (1) conducting an independent review of the 2018 Eagle Horizon results, including the evaluators' notes, the FEMA exercise evaluation guide, and the initial June 6, 2019 After Action Report, and developing a corresponding corrective action plan and (2) updating or developing its internal policies on planning and reporting test, training, and exercise events to align with federal continuity of operations directives and requirements. One recommendation is ongoing and one recommendation is scheduled for completion by June 30, 2021.

## REPORTS THAT HAVE BEEN REOPENED AS A RESULT OF OUR IMPLEMENTATION REVIEWS

### AUDIT OF ENVIRONMENTAL ISSUES AT THE GOODFELLOW FEDERAL COMPLEX IN ST. LOUIS, MISSOURI

**Period First Reported: October 1, 2018, to March 31, 2019**

Our objectives were to determine whether: (1) PBS informed building tenants, contractors, and visitors about identified environmental hazards at the Goodfellow complex and (2) PBS's response to the identified environmental hazards accorded with applicable laws, regulations, and policies. We made six recommendations, which were closed.

We completed an implementation review to determine whether PBS fully completed the corrective action steps to resolve the original audit report recommendations. We found that PBS failed to take appropriate measures to protect workers, tenants, contractors, and visitors from environmental contamination at the Goodfellow complex due to ineffective environmental programs, policies, and guidance. As a result, PBS reopened one recommendation and submitted a revised Corrective Action Plan to remedy these deficiencies. The recommendation has not been implemented.

The recommendation involves instituting controls to ensure that all health, safety, and environmental studies are distributed upon completion to the occupants of any Heartland Region property where studies are performed. The recommendation is currently scheduled for completion on June 30, 2021.

# APPENDIX III
# AUDIT AND INSPECTION REPORT REGISTER

| | | | FINANCIAL RECOMMENDATIONS | |
|---|---|---|---|---|
| DATE OF REPORT | REPORT NUMBER | TITLE | FUNDS BE PUT TO BETTER USE | QUESTIONED COSTS |
| (Note: Because some audits pertain to contract awards or actions that have not yet been completed, the financial recommendations related to these reports are not listed in this Appendix.) | | | | |
| **PBS PERFORMANCE AUDITS** | | | | |
| 02/04/2021 | A180110 | Audit of the Sidney R. Yates Federal Building Exterior Restoration Project | | |
| **PBS CONTRACT AUDITS** | | | | |
| 10/29/2020 | A190089 | Independent Examination of a Request for Equitable Adjustment: Hensel Phelps Construction Company, Contract Number 47PE0318C0003 | | |
| 12/09/2020 | A201022 | Independent Examination of a Final Settlement Proposal: The Christman Company, Contract Number GS-05P-15-FD-C-7002 | | |
| 12/21/2020 | A201042 | Independent Examination of an Architect/Engineer Proposal: Trivers Associates, Inc., Solicitation Number 47PF0020R0058 | | |
| 02/11/2021 | A200986 | Independent Examination of a Claim: Balfour Beatty Construction, LLC, Contract Number GS-11-P-17-MM-C-0002 | | |
| 03/19/2021 | A201036 | Independent Examination of a Final Settlement Proposal: Frederick Quinn Corporation, Contract Number 47PF0019C0040 | | $1,448,260 |
| 03/23/2021 | A200988 | Independent Examination of a Change Order Proposal: Volmar Construction, Inc., Contract Number 47PC0318C0002 | | |
| **FAS PERFORMANCE AUDITS** | | | | |
| 03/05/2021 | A201039 | Implementation Review of Corrective Action Plan: FAS Cannot Evaluate the FASt Lane Program's Performance for Contract Modifications, Report Number A170097/Q/7/P19001, October 24, 2018 | | |
| 03/30/2021 | A201009 | FAS's Packaged Office Furniture Program Limits Opportunities for Better Prices and Taxpayer Savings | | |

| DATE OF REPORT | REPORT NUMBER | TITLE | FINANCIAL RECOMMENDATIONS | |
|---|---|---|---|---|
| | | | FUNDS BE PUT TO BETTER USE | QUESTIONED COSTS |
| **FAS CONTRACT AUDITS** | | | | |
| 11/02/2020 | A180025 | Independent Limited Scope Postaward Examination of Multiple Award Schedule Contract Extension: CSP Enterprises, LLC, Contract Number GS-35F-045BA | | $1,311,752 |
| 12/11/2020 | A201002 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Logistics Management Institute, Contract Number GS-35F-134DA | | $44,359 |
| 12/11/2020 | A201003 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Haworth, Inc., Contract Number GS-03F-057DA | | $5,689 |
| 12/11/2020 | A201012 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Vaisala, Inc., Contract Number GS-07F-030DA | | $37,345 |
| 12/17/2020 | A200995 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Herman Miller, Inc., Contract Number GS-03F-036DA | | |
| 12/18/2020 | A190093 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Olympus America, Inc., Contract Number GS-07F-5933R | | $45,733 |
| 12/18/2020 | A201006 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Kimball International, Inc., Contract Number GS-03F-059DA | | $196,518 |
| 12/18/2020 | A201019 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: CGI Federal, Inc., Contract Number GS-35F-281DA | | $1,652 |
| 01/13/2021 | A200993 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: New England Woodcraft, Inc., Contract Number GS-03F-040DA | | |
| 02/04/2021 | A200992 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: The Rehancement Group, Inc., Contract Number GS-10F-0049X | | $61,234 |
| 02/17/2021 | A201030 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Life Fitness Sales, Inc., Contract Number GS-03F-120DA | | $9,098 |
| 02/18/2021 | A201029 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Capp, Inc., Contract Number GS-21F-0116X | | |
| 03/05/2021 | A201021 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Medical Science & Computing, LLC, Contract Number GS-35F-0373X | | |
| 03/10/2021 | A201043 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Square One Armoring Services Co., Contract Number GS-07F-162DA | | |
| 03/11/2021 | A201013 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Knoll, Inc., Contract Number GS-03F-078DA | | |
| 03/25/2021 | A201035 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: The Cogar Group, Ltd., Contract Number GS-07F-0625X | | |
| 03/31/2021 | A201040 | Independent Preaward Examination of Multiple Award Schedule Contract Extension: Invictus International Consulting, LLC, Contract Number GS-35F-305DA | | $2,100,090 |
| **OTHER PERFORMANCE AUDITS** | | | | |
| 11/4/2020 | A190085 | GSA's Mismanagement of Contract Employee Access Cards Places GSA Personnel, Federal Property, and Data at Risk | | |
| 02/17/2021 | A190016 | Audit of GSA's Insider Threat Program | | |
| **INSPECTION REPORTS** | | | | |
| 02/25/2021 | JE21-001 | GSA's National Capital Region Internal Fleet is Underutilized | $2,073,129 | |

# APPENDIX IV
# OIG REPORTS
# OVER 12 MONTHS OLD,
# FINAL AGENCY ACTION PENDING

Section 6009 of the Federal Acquisition Streamlining Act of 1994, Public Law 103-355, as amended by Section 810 of Public Law 104-106, requires the head of a federal agency to complete final action on each management decision required with regard to a recommendation in an Inspector General's report within 12 months after the date of the report. If the head of the agency fails to complete final action within the 12-month period, the Inspector General shall identify the matter in the semiannual report until final action is complete.

*The Office of the Chief Financial Officer, Office of Audit Management and Accountability provided the following list of reports with action items open beyond 12 months:*

| DATE OF REPORT | REPORT NUMBER | TITLE |
|---|---|---|
| **CONTRACT AUDITS** | | |
| 03/30/2017 | A150001 | Preaward Examination of Multiple Award Schedule Contract Extension: Noble Sales Co., Inc., Contract Number GS-06F-0032K |
| 04/20/2018 | A170046 | Preaward Examination of Multiple Award Schedule Contract Extension: Enlightened, Inc., Contract Number GS-35F-0703M |
| 06/12/2018 | A180035 | Preaward Examination of Multiple Award Schedule Contract Extension: Millennium Systems Services, Inc., Contract Number GS-10F-0594N |
| 02/21/2019 | A180052 | Examination of a Termination Settlement Proposal: Honeywell International, Inc., Contract Number GS-P-08-16-JE-7081 |
| 07/11/2019 | A180091 | Preaward Examination of Multiple Award Schedule Contract Extension: The Boston Consulting Group, Inc., Contract Number GS-10F-0253V |
| 11/07/2019 | A190038 | Limited Scope Postaward Examination of Multiple Award Schedule Contract: Overwatch Systems, Ltd., Contract Number GS-35F-0616X |
| 01/29/2020 | A170113 | Preaward Examination of Multiple Award Schedule Contract Extension: Palmetto GBA, LLC, Contract Number GS-02F-0089U |
| 03/31/2020 | A190060 | Preaward Examination of Multiple Award Schedule Contract Extension: Highrise Consulting, Inc., Contract Number GS-35F-0236W |

Case 4:16-cv-02789-JSW   Document 48-8   Filed 11/01/21   Page 64 of 74

| DATE OF REPORT | REPORT NUMBER | TITLE | PROJECTED FINAL ACTION DATE |
|---|---|---|---|
| **PERFORMANCE AUDITS** | | | |
| 08/10/2018 | A160133 | GSA's Public Buildings Service Does Not Track and Report All Unused Leased Space as Required | 05/31/2021 |
| 03/15/2019 | A170027 | Audit of Environmental Issues at the Goodfellow Federal Complex in St. Louis, Missouri* | 06/30/2021 |
| 06/19/2019 | A180073 | GSA's Northeast and Caribbean Region Lacks Policies and Procedures for Emergencies and Evacuations in Puerto Rico | 06/30/2021 |
| 08/23/2019 | A170047 | Audit of the PBS Great Lakes Region's Lease Financial Performance | 07/30/2021 |
| 03/27/2020 | A170056 | Audit of the Public Buildings Service's Photovoltaic Installations in the New England and Northeast and Caribbean Regions | 04/30/2021 |

*This audit was reopened as a result of an implementation review.

# APPENDIX V
# OIG REPORTS WITHOUT MANAGEMENT DECISION

Section 5(a)(10)(A) of the Inspector General Act of 1978, as amended, requires a summary of each report issued before the commencement of the reporting period for which no management decision has been made by the end of the reporting period.

There are no OIG reports that meet this requirement this reporting period.

Case 4:16-cv-02789-JSW     Document 48-8     Filed 11/01/21     Page 66 of 74

# APPENDIX VI
# MANAGEMENT DECISIONS REVISED OR WITH WHICH THE INSPECTOR GENERAL IS IN DISAGREEMENT

Section 5(a)(11) of the Inspector General Act of 1978, as amended, requires a description and explanation of the reasons for any significant revised management decision made during the reporting period. Section 5(a)(12) of the Act requires information concerning any significant management decision with which the Inspector General is in disagreement. There were no such decisions during this reporting period.

Case 4.16-cv-02789-JSW    Document 48-8    Filed 11/01/21    Page 67 of 74

# APPENDIX VII
# PEER REVIEW RESULTS

Section 5(a) (14)-(16) of the Inspector General Act of 1978, as amended, requires each Inspector General to submit an appendix containing the results of any peer review conducted by another Office of Inspector General (OIG) during the reporting period or, if no peer review was conducted, a statement identifying the date of the last peer review conducted; a list of any outstanding recommendations from any peer review conducted by another OIG that have not been fully implemented, the status of the recommendation, and an explanation why the recommendation is not complete; and a list of any peer reviews conducted by the OIG of another Office of Inspector General during the reporting period, including a list of any outstanding recommendations made from any previous peer review that have not been fully implemented.

In FY 2018, the GSA OIG Office of Audits underwent a peer review by the Department of Agriculture OIG. On September 26, 2018, the Office of Audits received a peer review rating of "pass." The peer review team found that the Office of Audits' system of quality control is suitably designed and complied with to provide it with reasonable assurance of performing and reporting in conformity with the quality standards established by CIGIE in all material aspects. No outstanding recommendations exist from any peer review conducted by another OIG. The Department of Labor OIG is scheduled to perform a peer review of the Office of Audits starting in April 2021.

In addition, the GSA OIG Office of Audits completed an external peer review of the Department of Health and Human Services. The Department of Health and Human Services has no outstanding recommendations issued by any previous peer review that have not been fully implemented.

In FY 2020, the GSA OIG Office of Investigations underwent a peer review by the Department of Education OIG and received a passing rating. The peer review team found that the systems of internal safeguards and management procedures for the Office of Investigations complied with the standards established for investigations by the Attorney General Guidelines and CIGIE. There were no outstanding recommendations from prior peer reviews.

In FY 2021, the GSA OIG Office of Inspections underwent a peer review by the Library of Congress OIG and Architect of the Capital OIG. The peer review team found the Office of Inspections' policies and procedures generally met the selected seven standards established in the January 2012 *CIGIE Quality Standards for Inspection and Evaluation*. The peer review team also found the selected report generally met the quality standards and complied with the Office of Inspections' internal policies and procedures. No outstanding recommendations exist for the Office of Inspections.

# APPENDIX VIII
# GOVERNMENT CONTRACTOR
# SIGNIFICANT AUDIT FINDINGS

The National Defense Authorization Act for FY 2008, Public Law 110-181, Section 845, requires each IG appointed under the Inspector General Act of 1978, as amended, to submit an annex on final, completed contract audit reports issued to the contracting activity as part of its Semiannual Report to the Congress.

The annex addresses significant audit findings — unsupported, questioned, or disallowed costs in excess of $10 million — or other significant contracting issues. During this reporting period, there were no reports that met these requirements.

# APPENDIX IX
# UNIMPLEMENTED
# RECOMMENDATIONS

## UNIMPLEMENTED RECOMMENDATIONS FROM REPORTS ISSUED BEFORE THE COMMENCEMENT OF THIS SEMIANNUAL REPORTING PERIOD

The table below provides a summary of each audit, inspection, or evaluation report issued before the commencement of the reporting period for which there are any outstanding unimplemented recommendations, including the aggregate potential cost savings of those recommendations.

| RECOMMENDATIONS UNIMPLEMENTED THAT ARE IN PROCESS | | | |
|---|---|---|---|
| FISCAL YEAR | TITLE | NUMBER OF UNIMPLEMENTED RECOMMENDATIONS | POTENTIAL COST SAVINGS |
| 2018 | GSA's Public Buildings Service Does Not Track and Report All Unused Leased Space as Required | 1 | $0 |
| 2019 | Audit of Environmental Issues at the Goodfellow Federal Complex in St. Louis, Missouri | 1* | $0 |
| 2019 | GSA's Northeast and Caribbean Region Lacks Policies and Procedures for Emergencies and Evacuations in Puerto Rico | 1 | $0 |
| 2019 | Audit of the PBS Great Lakes Region's Lease Financial Performance | 1 | $0 |
| 2020 | Audit of the Public Buildings Service's Photovoltaic Installations in the New England and Northeast and Caribbean Regions | 4 | $0 |
| 2020 | Audit of the Public Buildings Service's Green Roof Maintenance and Safety Practices | 1 | $0 |
| 2020 | GSA Needs to More Effectively Manage Its Workers' Compensation Program | 5 | $628,248 |
| 2020 | Audit of the GSA Public Buildings Service's Use of Construction Management Services | 2 | $0 |
| 2020 | The Federal Acquisition Service's Reporting of Small Business Procurements Contained Significant Inaccuracies | 1 | $0 |
| 2020 | Audit of GSA's Fiscal Year 2019 Travel Card Program | 1 | $0 |
| 2020 | Audit of Competition in Public Buildings Service National Capital Region Contracts | 3 | $0 |
| 2020 | Audit of GSA's Compliance with the Geospatial Data Act of 2018 | 1 | $0 |
| Totals: 12 | | 22 | $628,248 |

* This recommendation was reopened as a result of an implementation review.

## RECOMMENDATIONS UNIMPLEMENTED DUE TO AGENCY MANAGEMENT DISAGREEMENT

The table below provides a summary of each audit, inspection, or evaluation report for which there are any outstanding unimplemented recommendations due to an Agency management decision with which the Inspector General is in disagreement.

| RECOMMENDATIONS UNIMPLEMENTED DUE TO DISAGREEMENT | | | |
|---|---|---|---|
| FISCAL YEAR | TITLE | NUMBER OF UNIMPLEMENTED RECOMMENDATIONS | POTENTIAL COST SAVINGS |
| 2017 | GSA's Decisions to Vacate And Renovate the Leased Federal Courthouse in Pensacola Are Based on Faulty Premises | 2 | $0 |
| 2017 | PBS National Capital Region's $1.2 Billion Energy Savings Performance Contract for White Oak was Not Awarded or Modified in Accordance with Regulations and Policy | 3 | $0 |
| 2018 | Evaluation of GSA's Management and Administration of the Old Post Office Building Lease | 1 | $0 |
| 2018 | Evaluation of GSA Nondisclosure Policy | 1 | $0 |
| Totals:  4 | | 7 | $0 |

# APPENDIX X
# REPORTING REQUIREMENTS

The table below cross-references the reporting requirements prescribed by the Inspector General Act of 1978, as amended, to the specific pages where they are addressed. The information required by the National Defense Authorization Act for Fiscal Year 2008 and the Federal Acquisition Streamlining Act of 1994, as amended, are also cross-referenced to the appropriate pages of the report.

| REQUIREMENTS INSPECTOR GENERAL ACT OF 1978, AS AMENDED SECTION | | PAGE |
|---|---|---|
| 4(a)(2) | Review of Legislation and Regulations | 46 |
| 5(a)(1) | Significant Problems, Abuses, and Deficiencies | 5 |
| 5(a)(2) | Recommendations with Respect to Significant Problems, Abuses, and Deficiencies | 8-21 |
| 5(a)(3) | Prior Recommendations Not Yet Implemented | 51-56 |
| 5(a)(4) | Matters Referred to Prosecutive Authorities | 41-42 |
| 5(a)(5) and 6(c)(2) | Summary of Instances Where Information Was Refused | 9 |
| 5(a)(6) | List of OIG Reports | 57-58 |
| 5(a)(7) | Summary of Each Particularly Significant Report | 8-15, 24-25 |
| 5(a)(8) | Statistical Tables on Management Decisions on Questioned Costs | 21 |
| 5(a)(9) | Statistical Tables on Management Decisions on Recommendations That Funds Be Put to Better Use | 20 |
| 5(a)(10) (A) | Summary of OIG Reports Issued Before the Commencement of the Reporting Period Which No Management Decision Has Been Made | none |
| 5(a)(10) (B) | Summary of OIG Reports Issued Before the Commencement of the Reporting Period Which No Agency Comment was Returned within 60 Days | none |
| 5(a)(10) (C) | Summary of OIG Reports Issued Before the Commencement of the Reporting Period for Which there are Unimplemented Recommendations | 65-66 |
| 5(a)(11) | Description and Explanation for Any Significant Revised Management Decision | none |
| 5(a)(12) | Information on Any Significant Management Decisions with Which the Inspector General Disagrees | none |
| 5(a)(13) | Compliance with Federal Financial Management Improvement Act | none |
| 5(a)(14)-(16) | Peer Review Results | 63 |
| 5(a)(17) | Statistical Tables of Investigation Metrics | 41-43 |
| 5(a)(18) | Description of Investigation Metrics | 41-42 |
| 5(a)(19) | Investigations of Senior Employees where Misconduct was Substantiated | 37 |
| 5(a)(20) | Description of any Instance of Whistleblower Retaliation | none |
| 5(a)(21) | Description of any Attempt by the Agency to Interfere with OIG Independence | 9 |
| 5(a)(22)(A) | Description of each Inspection, Evaluation and Audit Not Publicly Disclosed | 59-60 |
| 5(a)(22)(B) | Description of Investigations involving a Senior Government Employee Not Publicly Disclosed | 37 |
| OTHERS | | |
| PL 103-355, Sec 6009 | Management Decisions and Implementation of Audit Recommendations | 59 |
| PL 110-181, Sec. 845 | Government Contractor Significant Findings | 64 |



# Make like it's your money!

## It is.

To report suspected waste, fraud, abuse, or mismanagement in GSA, call your

## Inspector General's Hotline

Toll-free 1-800-424-5210
Washington, DC metropolitan area
(202) 501-1780

or access the Web:
https://www.gsaig.gov/hotline/

or write:   GSA, IG, Hotline Officer
            Washington, DC 20405

Photo: Staircase alcove in former General Post Office, Tariff Building; now the Monaco Hotel, Washington, D.C.

www.twitter.com/GSA_OIG          https://www.gsaig.gov/content/rss-feeds



Office of Inspector General
U.S. General Services Administration
1800 F Street, NW
Washington, DC 20405
https://www.gsaig.gov